Arnold **GABRIELSEN** and Benzion Koenig, Plaintiffs,

v.

**BANCTEXAS GROUP, INC.**, Edward C. Nash, Jr., Michael G. Boswell, H. Glenn Butler, Charles Lee Davis, David Donosky, Jack D. Knox, John Lawrence, Bernard Rapoport, John A. Schlensker, H.D. Stanley, Charlie Thomas, C. Huston Bell, Edward O. Boshell, Jr., L.D. Brinkman, Kenneth R. Terry, Wayne G. Wickman, and Robert W. Wortham, III, Defendants.

Civ. A. No. CA3–85–2275–D.

United States District Court, N.D. Texas, Dallas Division.

June 17, 1987.

Dean Carlton, Dallas, Tex., for plaintiffs.

John L. Hauer, Robert E. Goodfriend, Robert B. Crotty, and Robert Elkin, of Akin Gump Strauss Hauer & Feld, Dallas, Tex., for defendants, BancTexas Group, Inc., et al.

James E. Coleman, Jr., Fletcher L. Yarbrough and Jeffrey S. Levinger, of Carrington Coleman Sloman & Blumenthal, Dallas, Tex., for defendant, Edward C. Nash, Jr.

1. No evidentiary hearing was held on the class certification motion based on the parties' representations that no hearing was necessary. *See*

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

Plaintiffs move to certify a class in this securities fraud action. The controlling question presented is whether plaintiffs have standing to assert their claims. Concluding that plaintiffs lack standing, the court dismisses the action.[1]

### I.
### BACKGROUND

Standing is a preliminary matter to be evaluated upon the allegations of the complaint. *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1168 (5th Cir. 1979). As it must, the court accepts as true the well-pleaded allegations of the complaint and construes the complaint in favor of plaintiffs. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). As so construed, the complaint, together with plaintiffs' papers, reflect the following.

In approximately November 1983, Guy Robertson, a member of the Board of Directors of BancTexas ("BTX"), met with representatives of Texas Commerce BancShares, Inc. ("TCB") concerning a possible merger of BTX and TCB. In this meeting Robertson apparently represented two other BTX directors, Ed F. Vanston and John Hazard, but not the BTX Board. As a result of these meetings, on November 22, 1983 TCB proposed by letter to merge with BTX subject to certain conditions. The letter proposal was hand-delivered to Vanston and Robertson who, in turn, hand-delivered it to BTX's chief executive officer, Ed Nash. Nash immediately called a special meeting of the BTX Board for December 5, 1983.

Soon after Nash received the proposal and called the December 5 meeting, BTX's stock traded in unusually heavy volume on November 25, 1983, the day after Thanksgiving, which is usually a day of light volume trading. At this point, however, there

February 10, 1987 order. *Cf. Merrill v. Southern Methodist University*, 806 F.2d 600, 608 (5th Cir.1986).

had been no authorized public disclosure of the TCB merger proposal. In fact, the proposed merger had been conditioned on the understanding that neither party would make any public release about the proposal until after the BTX Board had considered the proposal and TCB had made a preliminary review of BTX's assets.

On November 26, 1983, Nash insisted that TCB issue a unilateral press release stating that the merger proposal was unsolicited by BTX. Plaintiffs maintain that Nash insisted on the press release for the sole purpose of forcing TCB to withdraw its proposal before it could be considered by the BTX Board. TCB withdrew its merger proposal on November 27, 1983 and the December 5 Board meeting was cancelled. When Nash cancelled the meeting he reported that the merger proposal had been withdrawn by TCB when in fact, according to plaintiffs, he had intentionally forced withdrawal of the offer. Instead of meeting with the BTX Board on December 5, Nash called a meeting for December 5 of only the Executive Committee of the BTX Board. Nash allegedly called the meeting of the Executive Committee, rather than the BTX Board, for the purpose of preventing the BTX Board from considering the terms of the merger.

By letter, dated December 1, 1983, TCB told Nash that it would consider making another merger proposal if invited to do so. Nash did not advise the BTX Board that the December 1 proposal had been made, but told the Board by letter dated December 5, 1983 only that TCB had withdrawn its merger proposal and that there was no proposition before BTX. The terms of neither the November 22 nor December 1 offers were ever considered by the BTX Executive Committee or the BTX Board.

The BTX Executive Committee did meet on December 5, 1983 at which time Nash reported that Shearson American Express ("Shearson") had been retained to prepare a report on the current state of the banking industry and alternatives for BTX to consider. According to plaintiffs, Nash never revealed that in July 1983 he had retained Shearson, without authority of the BTX Board or the Executive Committee, to evaluate a possible merger with National BancShares, San Antonio or that Shearson would receive a commission based on a percentage of the consideration exchanged if any transaction with National Banc-Shares, San Antonio was consummated. Plaintiffs claim that Nash manipulated Shearson's report by giving Shearson projected operating results for the last quarter in 1983, which were more favorable to BTX than were the actual 1983 year-end results. Shearson's report did not evaluate TCB's merger proposals. Nash allegedly manipulated the report for the purpose of maintaining his position as Chief Executive Officer of BTX, a position plaintiffs presume he would not have retained if a merger occurred.

Based on Shearson's report, on January 16, 1984 the BTX Executive Committee unanimously voted that it was in the best interests of BTX to continue a course of independence, rather than a course of merger or acquisition. The Shearson report was then presented to the BTX Board prior to the start of the BTX Board meeting on January 18, 1984. The terms of the TCB proposal were not revealed to or considered by the full Board at this meeting. Shearson did state at the meeting, however, that the offer from TCB should not be ignored. Two of the directors, including Robertson, requested that Shearson be allowed to analyze the TCB proposals and moved for authorization of a committee to invite TCB to make another merger proposal to the Board. A majority of the BTX Board rejected the idea of receiving another merger proposal from TCB and instead decided to adhere to the recommendations of the Shearson report. In addition to the reasons already discussed, plaintiffs claim that the BTX Board voted to follow the Shearson report and not to seek another merger proposal because the directors were not generally prepared for meetings, when they did attend the meetings, or because they owed money to or worked for BTX and were therefore subject to control of BTX management. Plaintiffs claim that after the meeting Nash forced some of the

BTX Board members who did not support him to resign.

In February 1984 BTX issued its proxy statement for the March 28, 1984 annual stockholders' meeting. Proxies were solicited only for (1) election of 17 BTX directors, (2) approval of a proposal to amend BTX's restated certificate of incorporation to increase authorized series preferred stock, (3) approval of a proposal to increase the number of authorized shares under the BTX stock option plan, and (4) ratification of Arthur Andersen & Co. as independent auditors of BTX.

Plaintiffs, Arnold Gabrielsen and Benzion Koenig, filed this class action complaint on November 14, 1985. The complaint first alleges three state law [2] causes of action against Nash: (1) fraud and misrepresentation; (2) breach of fiduciary duty; and (3) negligence. Two state law causes of action—breach of fiduciary duty and negligence—are also alleged against the BTX Board and the Executive Committee. Finally, the complaint generally alleges federal proxy violations of § 14(a) of the Securities Exchange Act of 1934 ("the SEC Act").

## II.

### DISCUSSION

#### A.

■ The question whether a party has standing to prosecute a claim concerns the power of federal courts to hear and decide cases. Standing focuses on the party seeking to get his complaint before the federal court and not on the issues he wishes to have adjudicated. *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). When the issue of a plaintiff's standing is raised,[3] the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. To satisfy the constitutional requirement, the plaintiff who seeks to invoke judicial power must stand to profit in some personal interest. Absent a showing of personal injury, exercise of power by a federal court would be gratuitous and thus inconsistent with constitutional limitations. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38–39, 96 S.Ct. 1917, 1924–25, 48 L.Ed.2d 450 (1976).

■ Standing analysis is bipartite, involving both constitutional and prudential considerations. Constitutional standing analysis inquires whether a court possesses the jurisdictional power to hear a case; prudential analysis focuses upon a court's administrative discretion to hear a case. *Lewis v. Knutson*, 699 F.2d 230, 236 (5th Cir.1983).

■ The constitutional standing rules seek to ensure that a concrete Article III "case or controversy" exists by focusing on a plaintiff's "harm." They ask whether a plaintiff has "in fact" suffered a redressa-

2. Because BTX is incorporated in Delaware, the substantive law of that state governs disposition of plaintiffs' common law claims. *Cowin v. Bresler*, 741 F.2d 410, 414 n. 4 (5th Cir.1984).

3. The issue of standing must be overcome before the court considers the typicality of claims or commonality of issues required for procedural reasons by Rule 23. *Brown v. Sibley*, 650 F.2d 760, 771 (5th Cir.1981). Rule 23 does not alter the requirement that the court first consider the issue of jurisdiction because a change in the definition of matters in controversy would clearly conflict with the command of Rule 82 that the rules of civil procedure not be construed to extend or limit the jurisdiction of the United States District Court. *Snyder v. Harris*, 394 U.S. 332, 337, 89 S.Ct. 1053, 1057, 22 L.Ed. 2d 319 (1969).

Inclusion of class action allegations in a complaint does not relieve a plaintiff of himself meeting the requirements for constitutional standing, even if the persons described in the class definition would have standing themselves to sue. If the plaintiff has no standing individually, no case or controversy arises. *Brown*, 650 F.2d at 771. A person simply cannot represent a class of which he is not a member; he cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action. *Id.* If the court concludes that the proposed class representatives lack individual standing, the proper procedure is to dismiss the complaint, rather than to deny the class for inadequate representation or to allow other class representatives to step forward. *Id.* Dismissal on standing grounds is to take place before class certification issues are ever reached. *Id.*

ble injury as a result of the defendant's actions. The plaintiff must demonstrate that his injuries " 'fairly can be traced to the challenged action of the defendant,' or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 74, 98 S.Ct. 2620, 2630–31, 57 L.Ed.2d 595 (1978) (citations omitted).[4]

▪ Even where constitutional standing is established the court must also satisfy itself that prudential considerations warrant hearing the case. *See, e.g., Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–60; *Warth,* 422 U.S. at 500–01, 95 S.Ct. at 2205–07. In particular, the complaining party must demonstrate that his "injury" is of a sort against which the law seeks to protect him. *See Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–60. As applicable to the present case, if investors are to fall within the zone of protection of a statute, it must be specifically found that they are intended beneficiaries of that particular statute. *See, e.g., Moses v. Banco Mortgage Co.,* 778 F.2d 267, 272 (5th Cir. 1985).

### B.

*State Law Claims*

▪ Plaintiffs bring Delaware[5] common law claims for fraud and misrepresentation, breach of fiduciary duty, and negligence. The thrust of all these claims is corporate mismanagement by BTX. Defendants contend plaintiffs do not have standing to assert such claims because the claims belong to the corporation, BTX, and may only be asserted by a shareholder in a derivative action. The court agrees.

Delaware law and policy support the conclusion that plaintiffs' common law claims for damages must be pursued, if at all, on a derivative basis. Under Delaware law, issues of corporate management are committed to a corporation's board of directors. *See, e.g.,* 8 Del.C. § 141(a) which provides, in pertinent part, that: "The business and affairs of every corporation ... shall be managed by or under the direction of a board of directors...." In *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (1970), plaintiff shareholder charged that Getty Oil had, among other things, forced its wholly-owned subsidiary to purchase oil from Getty at an inflated price. The court characterized this claim as one "seek[ing] money damages for improper management" and held that such claims belonged to the corporation and not to its minority stockholders:

> When an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively in behalf of the corporation.

*Id.* The court concluded that "[m]ismanagement which depresses the value of stock is a wrong to the corporation; i.e., the stockholders collectively, to be enforced by a derivative action." *Id. See also Crane Co. v. Harsco Corp.,* 511 F.Supp. 294, 304 (D.Del.1981); *Elster v. American Airlines, Inc.,* 34 Del.Ch. 94, 98–99, 100 A.2d 219, 222 (1953).

*Bokat* reasons that claims of corporate mismanagement must be brought on a derivative basis because no shareholder suffers a harm independent of that visited upon the corporation and the other shareholders. Because each shareholder has been injured in proportion to his equity ownership, each will be made whole if the corporation obtains compensation or restitution from the wrongdoer. A contrary rule would authorize multitudinous litigation and ignore the corporate entity. *Cowin,* 741 F.2d at 414 (applying Delaware law). *See also Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 721 (5th Cir.1984) (directors' duties of loyalty and care run to the corporation, not to

---

**4.** This language imposes three fairly strict requirements, namely: (1) an injury; (2) a causal connection between the injury and the complained-of acts; and (3) "redressability." *See, e.g., Valley Forge Christian College v. Americans*

*United for Separation of Church and State, Inc.,* 454 U.S. 464, 472–74, 102 S.Ct. 752, 758–60, 70 L.Ed.2d 700 (1982).

**5.** *See* note 2, *supra.*

individual shareholders or even to a majority of the shareholders). Because the corporation and not the individual shareholder suffers the injury, when an officer, director, or controlling shareholder breaches a fiduciary duty to the corporation, the shareholder simply has no standing to bring a civil action at law against the faithless directors and managers. *Lewis*, 699 F.2d at 237–38 (applying Delaware law).

 Delaware's declaration that an individual does not have standing to challenge corporate mismanagement may be avoided either (1) by the filing of a derivative action, which in this case would be pursuant to Rule 23.1, or (2) by the allegation of some special injury to the individual plaintiff shareholder. From the pleadings and the motion for class certification, it does not appear that plaintiffs in the present case desire to, or can, proceed with their complaints in a derivative action. Under Rule 23.1 a shareholder must either make a demand upon the corporate directors for action or plead with particularity the exceptional circumstances that demonstrate why a demand would be futile. *Allison v. General Motors Corp.*, 604 F.Supp. 1106, 1112 (D.Del.1985). Rule 23.1 requires that a complaint in a derivative action "allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. *Atkins v. Tony Lama Co., Inc.*, 624 F.Supp. 250, 255 (S.D.Ind.1985). In the present case none of the necessary Rule 23.1 allegations have been made. Plaintiffs likewise have not alleged any of the grounds which would allow them, under Delaware law, to proceed with a non-derivative action. *See, e.g., Elster*, 34 Del.Ch. at 99, 100 A.2d at 222; *Condec Corp. v. Lunkenheimer Co.*, 43 Del.Ch. 353, 230 A.2d 769 (1967). Instead, plaintiffs allege only that their "special injury" is the violation of their voting rights under § 14(a). Because the court con-

cludes below that plaintiffs lack standing to assert a § 14(a) claim, the court holds that such a claim cannot constitute the allegation of a "special injury" for purposes of demonstrating standing to assert Delaware common law claims.

*Securities Act Claim*

 Applying the standing principles to plaintiffs' federal claim under § 14(a), the court must now determine whether plaintiffs have in fact alleged a real and immediate injury that is redressable by § 14(a), the constitutional standing limitation, and whether plaintiffs fall within the zone of interests protected by that section,[6] the prudential standing limitation.

Section 14(a) of the SEC Act, 15 U.S.C. § 78n(a), provides, in pertinent part:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce ..., in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit ... any proxy or consent as authorization in respect of any security ... registered pursuant to section 781 of this title.

The pertinent SEC regulation appears to be 17 C.F.R. § 240.14a–9 (1980), which provides:

No solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

---

**6.** In this case it appears that there the prudential and constitutional requirements overlap, for if plaintiffs have no injury that is redressable it may be because they are not within the zone of interests to be protected or regulated by § 14(a).

The determination whether plaintiffs have an injury which is redressable by § 14(a) or which falls within the zone of interests protected by § 14(a) is made by analyzing judicial decisions that have interpreted § 14(a).

Section 14(a) stems from a congressional belief that fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange. *Mills v. Electric Auto-Lite Company,* 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970). The provision was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought. *Id.* The purpose of § 14(a) is to prohibit management from deceptively securing stockholder approval for *transactions* requiring such approval. *See id.* at 382, 90 S.Ct. at 620–21. Thus, the essential requirements of a § 14(a) claim are (1) an underlying transaction for which management sought stockholders' approval or disapproval by solicitation of proxies and (2) an injury caused by the approval or disapproval of the transaction. Any misrepresentations in or omissions from the proxy solicitation must concern this underlying transaction. The injury complained of must have resulted from a corporate transaction which was authorized as a result of the false or misleading proxy solicitations. *Abbey v. Control Data Corp.,* 603 F.2d 724, 732 (8th Cir.1979). *See also Ash v. GAF Corp.,* 723 F.2d 1090, 1094 (3d Cir.1983) (complainant must show harm suffered from infringement of corporate suffrage rights or from corporate transaction approved because of inadequate disclosure in proxy solicitation). Moreover, the scope of the federal securities laws is limited: they address those injuries arising from *transactional* fraud, as opposed to the results of underlying corporate mismanagement. *See generally Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed. 2d 480 (1977).

In this case the transactions complained of were not authorized and did not occur as a result of the solicitation of proxies. The transactions complained of were never the subject of a proxy solicitation. If the transaction complained of did not occur because of or as a result of the proxy solicitation then any misrepresentations or omissions in the proxy itself are not the legal cause of pecuniary loss to the plaintiffs. *See Gaines v. Haughton,* 645 F.2d 761, 775 (9th Cir.1981). A complaint is simply not within the reach of § 14(a) if the transaction complained of occurred without shareholder approval or disapproval. *Id.*

The court concludes that § 14(a) was intended to benefit only those individuals (1) whose proxies were actually solicited to approve or disapprove a particular transaction, and (2) which transaction, which was approved or disapproved by the proxy vote, caused the complained-of injury. Section 14(a) was not intended to protect a shareholder complaining of a corporate action which was not the subject of a proxy solicitation. Such a shareholder has suffered no injury that is "redressable," is not within the zone of interests protected by § 14(a), and has no standing to assert a § 14(a) claim.

### III.

Because plaintiffs lack standing, the court does not reach the class certification question and, instead, dismisses this civil action. *See Brown,* 650 F.2d at 771.

SO ORDERED.