Gail and Ronald NOWLING

v.

**AERO SERVICES INTERNATIONAL, INC., et al.**

Civ. A. No. 90–775.

United States District Court,
E.D. Louisiana.

Nov. 29, 1990.

Henry Dillon Murchison, Normand Francis Pizza, Sandra A. Vujnovich, Brook, Morial, Cassibry, Fraiche & Pizza, New Orleans, La., for plaintiffs.

Gail P. Nowling, Lebanon, Tenn., pro se.

Ronald C. Nowling, Lebanon, Tenn., pro se.

Dando B. Cellini, Craig Lewis Caesar, McGlinchey, Stafford, Cellini & Lang, Harry A. Rosenberg, Maria Nan Alessandra, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Aero Services Intern., Inc., et al.

Walter C. Thompson, Jr., Mark Powell Seyler, Charles Michael Pisano, Sessions & Fishman, New Orleans, La., Barry F. McNeil, Nina Cortell, Teresa J. Carson, Leonard A. Hirsch, George W. Bramblett, Jr., Haynes & Boone, Dallas, Tex., Aubrey B. Hirsch, Jr., Locke, Purnell, Rain & Harrell, New Orleans, La., for Triton Energy Corp.

Robert Emmett Kerrigan, Jr., Harry S. Anderson, Duris Lee Holmes, Deutsch, Kerrigan & Stiles, New Orleans, La., for Robert L. Starer.

Harry A. Rosenberg, Mary Ellen Roy, Maria Nan Alessandra, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for third-party defendants.

## ORDER AND REASONS

FELDMAN, District Judge.

### BACKGROUND

As this bitter saga continues, the Court remains dismayed by the excessive combativeness of the parties. Everyone concerned seems to operate under the mistaken belief that the courtroom is an appropriate stage for the airing of their respective vendettas. We now enter still another round of personal bitterness.

The history of this fight stretches back to 1988 when Triton Energy, Trenk Development Company, and Robert Starer battled for the control of Aero Services International. Two suits were filed and then consolidated as the *Trenk* cases.[1]

On December 23, 1988, after several days of trial, the combatants settled and this Court entered an Order making Findings of Fact and allowing a Conditional Dismissal. Several months later, the parties memorialized their compromise by signing the Settlement Agreement, a Stand–Still Agreement, and a Shareholders Agreement.

The Shareholders Agreement ("Agreement") included provisions regarding, among other things, the new composition and voting powers of the Aero's Board of Directors, the resignation of Starer as CEO of the company, the purchases of certain Series B stock, and actions to be taken by Aero. (Triton got the right to appoint three members to the Board, which was later finalized when Messrs. Crowell, Graves and Puetz were chosen as directors of Aero in December 1988.)

The Agreement also included a provision directing the Aero Board to make "their best efforts to take action necessary with regard to the acquisition of Aero stock." (The Agreement, Paragraph 8.7). Among those who signed the Agreement were Starer (who was then president and CEO of Aero), Aero Services, and Triton as an Aero shareholder. This Court finalized the Agreement in its Findings of Fact and Stipulated Order Of Dismissal dated May 22, 1989 ("The *Trenk* Orders"). The Court specifically found, as part of the settlement, that the Louisiana Control Share Acquisition Act did not apply to Aero. Everyone agreed. Nevertheless, the tactical posturing continued.

At the time of the December 23, 1988 activity, all were aware of certain efforts to purchase Aero, both by a company

---

1. *Triton Energy Corp. v. Dibo Attar*, C/A No. 88–3492, consolidated with *Trenk Devel. Corp. v. Aero Serv. Int'l, Inc.*, C/A No. 88–3624.

owned by Trenk and by one called MAST Resources. Neither materialized. The Aero directors were not able to reach an agreement concerning either of the prospective suitors. As if it were their destiny, conflicts again arose between members of the Board and Starer (suspicions about Starer existed as far back as the *Trenk* litigation). On April 26, 1989, the Board asked Starer to resign as president of Aero, apparently to no avail. A few months later, another irritant surfaced.

On August 4, 1990, Triton purchased Dibo Attar's stock in Aero, giving Triton over 40% of the common stock of Aero. Mr. Attar resigned from the Board at the same time. The Aero Board firmly decided against a merger with MAST and, finally, secured Mr. Starer's resignation as president at an August 8 meeting.

One day earlier, on August 7, 1989, Starer applied to this Court for a temporary restraining order to block Triton from purchasing Attar's stock, claiming that the proposed purchase violated the *Trenk* Orders. Starer's temporary restraining order was denied, and he dismissed his suit on September 20, 1989. But the tactical posturing of everyone concerned became even more intense, especially driven by Starer.

Starer's relationship with the Aero Board continued to deteriorate. His real agenda surfaced. A shareholder's meeting was scheduled for March 29, 1990 and Starer notified Aero of his intention to offer a resolution at that meeting proposing that Aero be liquidated. The request was rejected. So Mr. Nowling, a shareholder of Aero and friend of Starer, sent out notices of a competing shareholders meeting which he also scheduled for March 29, 1990 (Nowling's entry was financed by Starer, who is paying for this litigation).

On February 28, 1990, Mr. and Mrs. Nowling, both Aero shareholders, filed suit in a Louisiana state court against Aero and Triton to enjoin the Aero shareholders meeting scheduled for March 29, 1990 but not initiated by the Nowlings. In spite of this Court's prior Order, the Nowlings also sought a declaratory judgment that the Control Act applies to Aero.

Aero and Triton then removed the suit to this Court and filed a counterclaim against the Nowlings and Starer, alleging that Starer had acted in concert with the Nowlings and that this Court's previous finding that the Control Act did not apply to Aero was binding. On April 4, 1990, this Court denied the Nowling's Motion to Remand, blocked their scheduled March 29, 1990 shareholders meeting, and confirmed that the Control Act does not apply to Aero.

Starer was not reelected to the Board at the March 29 shareholders meeting which had been called by the directors. Thereafter, on July 16, 1990, Starer filed a counterclaim against Triton and a third-party complaint against the Aero directors and Hughes Aviation, Inc.[2]

In Count I, Starer alleges that Triton breached the Shareholders Agreement by blocking and impeding the sale of Aero, causing Starer injury by virtue of the decrease in the value of his Aero stock and in his option to acquire other Aero stock. In Count II, Starer claims that Triton and the Aero directors breached their fiduciary duties of good faith, loyalty and fair dealing.

Once again, in Count III, Starer seeks declaratory relief regarding the application of the Control Act to Triton's acquisition of Aero stock from Attar. Starer also claims that Triton and the defendant directors Crowell, Graves and Puetz intentionally interfered with Starer's economic opportunity to realize a profit from his Aero stock.

Finally, Starer claims that Triton made filings under § 13(d) of the Securities Exchange Act of 1934 ("The Act") reflecting the fact of the settlement and Triton's undertaking to sell Aero, as stated in the Agreement. Starer alleges that Triton had no intention to sell Aero and the filings were false and misleading, in violation of The Act. Starer seeks damages as well as

---

2. Starer claims that Hughes, a Texas corporation in the same business as Aero, is a wholly-owned subsidiary of Triton and a competitor of Aero. Triton claims that Hughes is a trade name and is not a legal entity capable of suing or being sued.

any other legal, equitable or declaratory relief.

## DISCUSSION

This Court presently has before it two motions to dismiss Starer's claims pursuant to Rule 12(b)(6), one on behalf of Triton to dismiss Starer's counterclaims, and the other on behalf of the third-party defendant directors to dismiss Starer's third-party complaint.

Rule 12(b)(6) permits a motion to dismiss for failure to state a claim on which relief can be granted. Because matters outside the pleadings are presented to the Court, these motions shall be treated as ones for a Rule 56 summary judgment. For this Court to grant Triton and the director defendants' motions, there must be no genuine issue of material fact. But the mere existence of some factual disputes will not defeat an otherwise properly supported motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### 1. *Application of the Control Act to Aero*

▮ Once again, this Court is asked to address the issue of whether the Control Act applies to Aero. Starer, undaunted by two prior rejections, says it does.

In the Findings of Fact and Stipulation of Dismissal entered on May 22, 1989 in the *Trenk* litigation, this Court specifically found that the Control Act does not apply to Aero.

Then again, during this round of litigation, on April 6, 1990, this Court reexamined the Control Act issue when considering an application for a preliminary injunction by Aero and Triton. At that time, barely six months ago, this Court found that no evidence had been presented to contradict its earlier finding that the Control Act does not apply to the voting shares of Aero. In fact this Court went so far as to say, after hearing the new evidence, that "evidence taken at the hearing of [the] matter has only served to reinforce this Court's conclusions in *Trenk.*" *See OR-DER AND REASONS,* April 6, 1990, at 15 n. 8.[3]

Starer argues that the Control Act should apply to Triton's purchase of Dibo Attar's stock on August 4, 1989 because it is different from the April 1988 transactions which prompted this Court's finding in the *Trenk* Orders. This Court need not address the res judicata issue, but may simply examine the facts of record to determine whether the Control Act applies. Starer has not offered any facts, nor can the Court find any extraneous evidence, which establishes a change in Aero's status that requires special treatment of the August 4, 1989 transaction as it relates to the Control Act.

This Court's function is to apply law to facts, not to work miracles. No good or new reason is offered why the Control Act should now apply to Aero, and this Court reiterates that on this record it does not apply.

### 2. *The Claim For Tortious Interference*

▮ In Count 4 of his Counterclaim and Third–Party Complaint, Starer maintains that his primary reason for entering into the Shareholders Agreement and settling the *Trenk* litigation was to realize a return on his substantial investment in Aero stock. Starer claims that Triton and the defendants Crowell, Graves and Puetz intentionally interfered with Starer's economic opportunity through their efforts to block the sale of Aero. Starer concludes that as a result of the intentional interfer-

---

**3.** For the Control Act to apply, a corporation must be an "issuing public corporation." La. R.S. 12:136. The statute defines issuing public corporation as a corporation that has

 (a) One hundred or more shareholders;

 (b) Its principal place of business, its principal office, or substantial assets, whether owned directly or through one or more wholly-owned subsidiaries, within Louisiana; and

 (c) One or more of the following:

 (i) More than 10% of its shareholders reside in Louisiana.

 (ii) More than 10% of its shares owned by Louisiana residents.

 (iii) 10,000 shareholders reside in Louisiana.

La.R.S. 12:135(4).

ence, his opportunity to realize a profit from his Aero stock was destroyed.

The defendants maintain that Louisiana law does not recognize a tort such as Starer describes. Although Louisiana does recognize the tort of interference with contract under limited circumstances, defendants claim that Louisiana does not recognize any interference with business or economic opportunity.

While Starer labels his grievance as one for "interference with economic opportunity," it is the content of this tort that is at issue. The liberal approach of the federal rules to pleading requires no recitation of catch-words. *Dussouy v. Gulf Coast Invest. Corp.*, 660 F.2d 594, 601 (5 Cir.1981). Regardless of how the claim is characterized, the issue is whether, taking all facts in the light most favorable to plaintiff, Starer is entitled to recover for some form of tortious interference. *Id.; Tallo v. Stroh Brewery Co.*, 544 So.2d 452, 453 (La.App. 4 Cir.1989). In effect, he asks this Court to draw new contours to a very limited form of recovery in Louisiana.

The tort that Starer complains of is amorphous in nature and boasts a unique and unfriendly history in Louisiana law. Louisiana courts have been hostile to the idea of finding fault for business torts or to fashioning broad relief for such activities. For years, Louisiana was the only state that did not recognize the tort of interference with contract. However, in *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La.1989), the Supreme Court of Louisiana yielded to the pressures of other state courts and contemporary doctrine, and adopted such a tort as a form of delictual conduct. But that court announced a limited concept. Although the tort of interference with contract has now been recognized in Louisiana, this Court has found no cases in which someone has actually been held liable. Such is the environment into which Starer enters.

■ Civil Code Article 2315 is the source provision for the defining scope of delictual conduct in Louisiana and is thus the source for tortious interference actions. *Tallo*, 544 So.2d at 453. Article 2315 states the oft-taught rubric that "every act whatever of [an individual] that causes damage to another obliges [that individual] by whose fault it happened to repair it." *9 to 5*, 538 So.2d at 231. Some kind of fault must be present before one can recover for the damage caused; to maintain a claim for tortious interference, fault can be the result of neglect or found in the relationship one party has to another. *Tallo*, 544 So.2d at 454.

■ In addition, and of particular importance, the duty alleged to have been breached by the third party interferer must be more than merely derivative of the duty of good faith imposed upon the parties to the contract itself. *Spencer–Wallington v. Service Merchandise*, 562 So.2d 1060, 1064 (La.App. 1 Cir.1990). What does that mean? In *9 to 5*, a corporate officer was charged with interfering with a supply contract between the corporation and the plaintiff supplier. The court found that the independent fiduciary duty imposed upon the corporate officer to not intentionally cause the company to breach the contract or to make performance more burdensome created a separately identifiable duty sufficient to implicate officer fault. *9 to 5*, 538 So.2d at 231. It is this discrete feature of the case literature which Starer overlooks.

■ Starer and Triton are both parties to the Shareholders Agreement; a contractual duty exists between them. The Shareholders Agreement does include a provision directing the Aero Board to make their best efforts to take action necessary with regard to the acquisition of Aero stock. Even if Triton has somehow offended this provision, its action cannot conceptually constitute tortious interference because the only duty Triton has breached is "merely derivative of the duty of good faith imposed upon the parties to the contract." *Spencer, supra.* In *9 to 5*, the court limited the tort of interference with contract to the narrowly focused situation in which an officer in a corporation has intentionally interfered with a contract between the cor-

poration and someone else. *Id.* at 234.[4] To repeat, the Shareholders Agreement is partly between Starer and Triton. One who violates its provisions might possibly commit a breach of contract, but a contract's signers cannot tortiously interfere with their own contract under Louisiana's limited case doctrine. Thus, Starer has no cognizable claim against Triton for tortious interference as it has been judicially drawn in Louisiana.

What about the directors?

■ Although Aero is a party to the contract, the third-party defendants, Crowell, Graves and Puetz, are not. They do, however, have fiduciary duties as directors of Aero. Despite the fact that they may have certain fiduciary obligations to Starer, superficially analogous to the officer's fiduciary duties to the plaintiff supplier in *9 to 5*, neither their relationship to Starer nor the interests involved can accommodate a tortious interference claim.

■ Starer maintains that his interest in the Shareholders Agreement was the potential economic opportunity to make a profit on his investment in Aero stock, if Aero were sold. His desire for monetary gain is the economic opportunity Starer claims the directors intentionally interfered with when they allegedly attempted to block the sale of Aero. In Louisiana, tortious interference is said to be actionable because one must be protected from malicious and wanton interference with one's business arrangements. Business arrangements which are fixed and definable. *McCoin v. McGehee*, 498 So.2d 272 (La. App. 1 Cir.1986). In essence, Louisiana's narrow doctrine instructs that a third party cannot maliciously meddle in matters that amount only to a notion of how one ought to act.[5] *See McCoin, supra.* Something more is required.

The contract provision at issue merely recognized certain implicit duties of good faith. The contract did not create a binding obligation to sell Aero, but, rather, only to make best efforts regarding any potential sale. The contract was not specific, did not create explicit conduct obligations, or specific monetary obligations on the part of either party. Starer's interest is at best without shape, and the contract itself creates no specific juridic or economic right with which a third party could interfere under the present state of Louisiana case literature.[6] It merely specifies how one ought to act with respect to the open concept of a sale of Aero.

■ Starer's tortious interference claim contains still another conceptual flaw. The directors, within the bounds of their corporate duties, have a protected right to deal with whom they want, because an individual has an absolute right to

---

**4.** The driving elements announced in *9 to 5* are:
(1) The existence of a contract or a legally protected interest between the plaintiff and the corporation;
(2) the corporate officer's knowledge of the contract;
(3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome;
(4) absence of justification on the part of the officer;
(5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.
The court stressed its restrictive recognition of a new form of delict:
"It is not our intention, however, to adopt whole and undigested the fully expanded common law doctrine of interference with contract, consisting of 'a rather broad and undefined tort in which no specific conduct is proscribed....' In the present case we recognize ... only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." 538 So.2d 228 at 234.

**5.** An individual may only interfere if the interference is designed to protect a well-defined interest of that third party. *Id.* In addition, the interference must be done with malice. *Dussouy v. Gulf Coast Invest. Corp.*, 660 F.2d 594, 602 (5 Cir.1981).

**6.** Starer's only alleged injury is the loss in value of his Aero stock. This injury is not specific to Starer and is derivative in nature. *See* Section 4 of this Order and Reasons, where the Court discusses Starer's standing to assert claims for breach of fiduciary duty, breach of contract and tortious interference with economic opportunity.

refuse to deal with another. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 601 (5 Cir.1981). For the directors to have acted tortiously towards Starer, Starer must establish that the defendants prevented him from dealing with third-party potential buyers. That is the present construct of this new Louisiana tort. *See McCoin, supra.* And this Court must be faithful to that limited model. Starer does not claim, nor do the facts indicate that the defendants in any way attempted to influence others not to deal with Starer himself.[7]

It is instructive to examine Starer's role with regard to Aero during this time. Starer was the president and CEO of Aero until August 8, 1989. Starer was on the Board of Directors of Aero until March 29, 1990. Starer remains a shareholder of Aero to this day. At all points Starer's identity, although he has been wearing many hats, has been wrapped up in the identities of the corporation and of the defendants.

Starer's business relationship to the prospective buyers of Aero, the relationship that was allegedly interfered with, is not separate and distinct from the defendants or Aero. Starer had certain fiduciary duties of care and loyalty, as did the defendants, to Aero. As Starer's office changed, so too did his duties; however, at no point was he acting as an independent and distinct person, but, rather, as president, CEO, or major shareholder. Starer had no separate business relationship with the potential buyers with which the defendants could have interfered.

Thus, although the actions taken by the defendants can and should be judged according to the tenets of corporate law or contract law, Starer is not in a position to maintain a tort suit under any doctrinally cognizable theory of tortious interference in Louisiana.

### 3. *Starer's Standing Under Section 13(d) of the Securities Exchange Act.*

 In Count 5 of his Counterclaim and Third-Party Complaint, Starer asserts that Triton violated § 13(d) of the 1934 Act by filing false and misleading information. Section 13(d) of the 1934 Act, 15 U.S.C. § 78m(d), requires those who acquire over 5% of a class of stock registered under § 12 of the 1934 Act to report certain information in a Schedule 13D filing to the issuer, the appropriate stock exchange, and the SEC within ten days of acquisition.

In December 1988, Triton made a filing under § 13(d) which included information concerning the settlement and the Shareholders Agreement. Starer contends that the settlement and the Agreement reflect Triton's intentions to sell Aero.[8] Starer claims the Schedule 13D information was misleading because Starer was under the impression that defendants intended to sell Aero but, in reality, defendants had no such intention. His stated impression goes far beyond the text and intent of the Agreement itself.

Although this Court may not resolve, in motion practice, the factual question of whether the 13(d) information was misleading, the Court may resolve the question of law as to whether Starer has standing to bring a private action for violation of Section 13(d).

 The Williams Act, of which 13(d) is a part, was passed by Congress in 1968, and was subsequently amended in 1970 and 1977. The Williams Act was passed to insure that shareholders and potential investors would have available to them information about changes in ownership and

---

**7.** Even if defendants' actions affected Starer's business interests, this is not enough to support a tortious interference claim. *See Ustica Enterprises v. Costello,* 434 So.2d 137, 140 (La.App. 5 Cir.1983) (no action for tortious interference with business when radio station did not run advertisements for company that had agreement to run adds mentioning third party on radio station).

**8.** Paragraph 8.7 of the Shareholder's Agreement states that "the Parties hereby covenant and agree to use their best efforts to take any and all action necessary to proceed in connection with a proposed acquisition of AERO, of all the AERO Stock or any merger or other business combination involving AERO." It binds no one to any particular terms, conditions, prices or timetables.

control of the issuer so that they could make informed investment decisions. *Rubin v. Posner*, 701 F.Supp. 1041, 1050 (D.C.Del.1988), citing 1968 U.S.Code Cong. & Admin.News, 2811–12. The purpose was not to favor management or its adversaries but to insure that the shareowning public, confronted by a cash tender for their stock, would have adequate information about the qualifications and intentions of the offering party before responding to the offer. *Gearhart Industries, Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 713 (5 Cir.1984), citing *Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 944, 51 L.Ed.2d 124 (1977); *see also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975).

Again, however, it is important to return to the central fact that Starer cannot simply be looked upon as a shareholder of Aero. When the filing was made, Starer was the president and CEO of Aero. After he resigned his post in August 1989, he remained on the Board until March of 1990.

Section 13(d) was not designed to protect ex-presidents or ex-board members who want to get back at their previous co-fiduciaries for disagreements or squabbles lost along the way. The Williams Act was meant to be neutral and the draftsmen took extreme care to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. *Gearhart* 741 F.2d at 717, citing S.Rep. No. 550, 90th Cong, 2d Sess, 4 (1968); HR Rep. No. 1711, 90th Cong., 2d Sess, 4 (1968), U.S.Code Cong. & Admin. News 1968, 2811.

During the time that the offers to buy Aero were under review by the Aero

Board, Starer was part of management.[9] At the very time the MAST proposals were considered, and when they were finally rejected on August 8, 1990, Starer was the president and CEO of Aero.[10] Starer had full access to the information that was considered regarding the proposed sales and participated in the voting.

As the Supreme Court has noted, the focus of the Williams Act is full and fair disclosure to the investing public. *Gearhart*, 741 F.2d at 715, citing *Piper*, 97 S.Ct. at 944. It legislatively recognizes the social desirability of giving selling stockholders access to a level playing field. The Williams Act was not intended to protect Starer in his position as an officer or director of Aero.

Triton also stresses that Starer's 13(d) claim must be dismissed because private actions are not available under the statute. It is clear that there is no basis in the statute's own text for implying a private right of action in anyone; the legislative history of 13(d) contains no suggestion that Congress intended the grant of such a right. *Liberty Nat. Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 564 (11 Cir. 1984).[11]

Many courts, including the Fifth Circuit, have held that 13(d) does not grant a private right of action for damages, *e.g.*, *Gearhart*, 741 F.2d at 714, citing *Liberty*, 734 F.2d 545; *Pin v. Texaco, Inc.*, 793 F.2d 1448, 1452 (5 Cir.1986). The Fifth Circuit does, however, permit a target corporation to assert a private action for injunctive relief. *Gearhart*, 741 F.2d at 714, citing *e.g., Indiana Nat. Corp. v. Rich*, 712 F.2d 1180 (7th Cir.1983).[12]

---

**9.** When the *Trenk* litigation was resolved by this Court's Order on December 23, 1988, there were two pending offers to purchase Aero. One was made by a company owned by Trenk and one made by MAST Resources, Inc. The MAST proposals were considered on several occasions by the Aero Board and finally rejected on August 8, 1989.

**10.** Starer resigned as president during the same executive session that the MAST proposal was finally rejected.

**11.** Triton points to § 18(a) as the statute that provides the exclusive private remedy for dam-

ages sustained by one who, in reliance upon a false or misleading statement, purchased or sold a security at a price which was affected by such statement. Triton is correct that Starer makes no claim under 18(a).

**12.** The precedent for this narrow exception stems from *Piper*, 97 S.Ct. at 926, where the Court held that a tender offeror has no cause of action under 13(d) for damages because the Act was to benefit the target shareholders. *First Alabama*, Fed.Sec.L.Rep. at 98,015, citing *Piper, supra.*

The Fifth Circuit, like other courts, permits injunctive relief only under certain compelling circumstances. "Injunctive relief is a drastic medicine indeed. As is familiar law, it should be carefully tailored to the situation presented and should be no broader that necessary to accomplish the purpose of the court in granting it." *Gearhart*, 741 F.2d at 715.

In addition, such relief should only be granted with the limited goal of enforcing the purpose of the Williams Act to safeguard complete disclosure. *Id.*, citing *Piper*, 97 S.Ct. at 944; *e.g., Sanders v. Thrall Car Manufacturing Company*, 582 F.Supp. 945, 961 (S.D.N.Y.1983) (injunctive relief only available to insure that statute's underlying disclosure objective is met, to alert the marketplace to every large, rapid aggregation or accumulation of securities which might represent a potential shift in corporate control).

 Even if Starer did have standing, he is not entitled to equitable relief under 13(d). Starer complains that defendants' 13(d) information did not include a true statement of their intentions not to sell Aero. Starer claims that defendants made filings "reflecting the fact of the settlement and Triton's undertaking pursuant to the Shareholders Agreement to sell Aero."

If Starer is to obtain injunctive relief, he must show he has been harmed in a way that can be redressed by 13(d). *Rondeau*, 95 S.Ct. at 2076–2077. Starer is not claiming that aggregation of Aero stock was not disclosed. And this Court can do nothing to provide Starer with more information than he already had in his various leadership roles at Aero. Starer was in lead management, and had access to all the information available regarding the prospective sales of Aero. Even if Starer had standing to request it, there is no equitable relief available which would more fully satisfy the purpose of 13(d) with regard to him.

**4.** *Starer's Standing as an Individual to Assert Claims for Breach of Fiduciary Duty, Breach of Contract, and Tortious Interference With Economic Opportunity.*

Triton and the third-party defendants argue that Starer has no standing as an individual to make certain claims belonging to Aero as a corporation. In Count 1 of his Counterclaim, Starer claims that Triton breached the Shareholders Agreement in blocking and otherwise impeding the sale of Aero.

Starer also claims that the actions of Triton and the third-party defendants in impeding the sale of Aero stock constitute breaches of defendants' fiduciary duties to Starer.[13]

Defendants underscore that the only harm Starer claims to have suffered as a result of the alleged violation of the Shareholders Agreement and of fiduciary duties is a decrease in the value of stock. Such harm, they say, damages the corporation directly and the shareholders only indirectly, and, therefore, the claims may only be asserted derivatively.

### a) Starer's Breach of Fiduciary Duty Claim

 Certain claims made by shareholders must be made derivatively on behalf of the corporation because the questioned actions by their nature directly harm the corporation and only indirectly harm the shareholder. For example, an injury to corporate stock burdens all shareholders indiscriminately and thus an individual shareholder has no standing to make the claim. *E.g., Gabrielsen v. Banctexas Group, Inc.*, 675 F.Supp. 367, 373 (N.D. Tex.1987); *Wilson v. H.J. Wilson Co.*, 430 So.2d 1227, 1234 (La.App. 1 Cir.1983).

 The origins of the standing requirement are found in Article III of the Constitution, which requires someone who

---

**13.** Starer also adds that the alleged tortious interference with the Shareholders Agreement caused his stock to decrease in value. Defendants contend that this claim is derivative in nature and may not be made by Starer individu-

ally. Because this Court has held that Starer has no claim for tortious interference under Louisiana law, the standing issue regarding this claims is not reached.

asserts injury to show that the claimant has personally suffered some actual or threatened injury. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). An exception to the general standing requirement regarding shareholder actions allows shareholders with an identifiably direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated. *Franchise Tax Bd. v. Alcan Aluminum,* —— U.S. ——, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990).

■ Starer claims that because he suffered a personal loss as a shareholder, he is entitled to sue for breach of defendants' fiduciary duties. Although Starer might have standing to bring a claim for some special duty owed personally to him through the Shareholders Agreement, *United States v. Palmer,* 578 F.2d 144, 145 (5 Cir.1978), conduct which depresses the value of company stock is a wrong to the corporation; it is a wrong to the shareholders collectively; it must be enforced derivatively. *Gabrielsen,* 675 F.Supp. at 372.

■ Misconduct on the part of the directors reacting to a tender for all the corporation's stock may also be redressed only through a derivative suit because the shareholders are disadvantaged in proportion to their share of ownership. *O'Neill v. Church's Fried Chicken, Inc.,* 910 F.2d 263, 267 (5 Cir.1990). And so Starer's claim that defendants committed fiduciary misconduct regarding the sale of Aero involves exactly the kind of grievance and the kind of collective harm that a shareholder cannot claim individually. Starer has not shown that the injury to his stock is so distinct from the injury suffered by other shareholders, nor has he shown that his injury is separable from his stock ownership in Aero.

■ State law determines whether a shareholder may maintain a nonderivative action. *Crocker v. Federal Deposit Ins.*

*Corp.,* 826 F.2d 347, 349 (5 Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1075, 99 L.Ed.2d 235 (1988). In 1968, in an amendment to La.R.S. 12:91, the fiduciary relationship between officers and directors was expressly extended to shareholders.[14] As the official comment to the statute notes, Louisiana law follows the general rule that an action to recover from an officer or director for a breach of fiduciary duty is secondary and must be asserted through a shareholder's derivative suit. *Beyer v. F & R Oilfield Contractors, Inc.,* 407 So.2d 15, 17 (La.App. 3d Cir.), *cert. denied,* 411 So.2d 451 (La.1981).

In a case factually similar to this one, the court carefully analyzed the statutes and cases bearing on shareholder actions in Louisiana and held that an action for mismanagement or fraud belongs to the corporation, not to the shareholders. *Bordelon v. Cochrane,* 533 So.2d 82, 86 (La.App. 3 Cir.1988), citing *Beyer, supra.* In *Bordelon,* a minority shareholder claimed that, among other things, the other shareholders and directors in a closely held corporation breached their fiduciary duties to him, thus causing him to suffer personal loss. The court noted that breaches of fiduciary duties which are not contractual create a cause of action for mismanagement belonging to the corporation and must be brought derivatively. *Bordelon,* 533 So.2d at 86. *See also Landry v. Thibaut,* 523 So.2d 1370 (La.App. 5 Cir.1988) (when damage to shareholders was reflected in a decline of stock value claim of mismanagement could only be brought derivatively).

Because Starer has not demonstrated he has any legally recognized right to separately recover for breaches of the fiduciary duties established by La.R.S. 12:91, and because he has admittedly not claimed to be a representative of Aero for purposes of asserting a derivative suit, such claims belong to the corporation and must be dismissed.

---

**14.** La.R.S. 12:91 provides:

"Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent [individuals] would exercise under similar circumstances in like positions...."

### b) Breach of Contract

■ In Count 1, Starer claims Triton breached the Shareholders Agreement by its actions and the actions of the third-party defendants in blocking and otherwise impeding the sale of Aero. Starer reasserts that because of such breaches, he has been damaged by the decrease in the value of his stock and his option to acquire other Aero stock.

Defendants repeat that the claim for breach of contract cannot be brought by Starer individually because the nature of the injury allegedly caused by the breach—a diminution of the value of Aero stock—is quintessentially a derivative issue.

As was already discussed, the exception to the threshold requirement of standing permits a shareholder to bring a claim as an individual for violation of a duty owed particularly and distinctly to the shareholder. A shareholder's agreement creates such a contractual duty between the parties to the contract. *Bordelon*, 533 So.2d at 86. Thus Starer, on the surface, has a private cause of action against defendants for breach of contract. But the formality of a contract does not drive the resolution of this question. We are again brought back to the character of the grievance at issue.

■ The actual injury complained of by the shareholder anchors the decision of whether the shareholder has sustained a loss distinct from the corporation. Louisiana, like other states, recognizes that an injury to shareholders in the form of a diminution in the value of stock is a loss that is recoverable only by the corporation in a direct action by the company, or by the shareholders derivatively. *E.g., Landry v. Thibaut*, 523 So.2d at 1377. This is true even when plaintiff seeks damages described as resulting from a breach of contract. *Crocker*, 826 F.2d at 349 n. 3, citing *Vickers v. First Mississippi National Bank*, 458 So.2d 1055, 1062 (Miss.1984).

Thus, Starer may not maintain an individual claim for breach of contract damages involving the diminution of his Aero stock. Such a claim redresses injury which is not unique to Starer but which reflects damage to the corporation and to other shareholders. Such damages are derivative in nature.

Aside from the diminution in value of Aero stock, Starer also claims he has been damaged because of the decrease in value of his option to acquire other Aero stock. Apparently, the Shareholders Agreement includes reference to a certain Option Agreement with Starer dated November 27, 1987. No one has provided a copy of this agreement, or explained the duties it created.

It is possible that the damage to Starer's option is similar to damage to stock value in general, and derivative in nature only. Starer claims he has lost his ability to realize a profit from the contractual option memorialized in the Agreement. Because the parties have not sufficiently briefed the Court about the facts regarding this claim, the Court requires additional submissions and briefs within ten days on this issue only, and reserves decision.

### 5. *Starer's Claims Against Hughes Aviation Services*

■ Hughes Aviation Services, Inc., whether or not it exists as a legal entity, was not a party to the Agreement and for all the reasons given earlier cannot be liable for breach of contract. It must therefore be dismissed.

### CONCLUSION

The Control Act does not apply to Triton's acquisition on August 4, 1989 of the Attar stock because the Control Act does not apply to Aero.

Starer has no standing to bring a private action for breach of contract or breach of fiduciary duty against defendants for loss in the value of his Aero stock.

Starer has failed as a matter of law to state a claim for tortious interference with an economic opportunity.

Starer has no standing to bring a private action under Section 13(d) of the Securities Act of 1934.

Third–Party Defendants' Motion to Dismiss is GRANTED.

Triton's Motion to Dismiss is GRANTED in part. A decision on Starer's breach of contract claim for damages involving the decrease in value of Starer's option to acquire other Aero stock is reserved pending further briefing as ordered.