# FRANK C. HOHMAN *v.* THE A. S. ABELL COMPANY

[No. 238, September Term, 1979.]

*Decided November 13, 1979.*

The cause was argued before GILBERT, C. J. and COUCH and MACDANIEL, JJ.

*Frank H. Newell, III,* for appellant.

*James K. Archibald,* with whom were *Venable, Baetjer & Howard* on the brief, for appellee.

COUCH, J., delivered the opinion of the Court.

The question before the Court in this appeal is whether the trial court erred in directing a verdict in favor of The A. S.

Abell Company, defendant below and appellee here, in a civil suit filed against it by Frank C. Hohman, plaintiff below and appellant here, for damages resulting from an allegedly libelous statement contained in an article printed in appellee's newspaper, *The Sun.*

Prior to Frank C. Hohman's (appellant) retirement on December 1, 1975, he was a major in the Baltimore County Police Department with over 29 years of service. Appellee's morning newspaper, *The Sun,* began publishing a series of articles on August 24, 1975 dealing with towing operations in Baltimore County. The final article, published on January 22, 1976, generated the present dispute. Considering the nature of this case, we shall set forth the entire article below:

> "Baltimore county police were lax in their regulation of towing firms, according to a 3-1/2-month internal investigation of charges of favoritism in the county's police-controlled towing business.
>
> The formal investigation report cites for 'nonfeasance' an unspecified number of unnamed high-ranking officers no longer with the department.
>
> Although the report finds no evidence of criminal misconduct by current or former policemen, it says 'subjective evidence would indicate that police officials had not fully exercised their administrative abilities' in overseeing those firms licensed to take police calls to tow disabled vehicles.
>
> Specifically, the report concludes that, in the past, towing license applications were approved or disapproved without written justification, official records of towing licensees were poor or non-existent and the tow truck operators were seldom if ever inspected for compliance with the law.
>
> The nine-page report, dated January 7 and signed by Joseph R. Gallen, the police chief, has not yet been made public, but copies have been distributed within the department and sent to the county executive and state's attorney.

Sandra A. O'Connor, the state's attorney, will use the findings in her own probe of the department and the towing industry. She has said this investigation will be a top priority of the new grand jury sworn in last week.

The report is the first formal confirmation of articles in *The Sun* as early as August stating that a 'politically well-connected Essex garage owner had established the largest towing business in that area, apparently because county police had limited his competition by control of the licensing procedure and had gerrymandered his authorized zone of operations to include some of the county's most heavily traveled roads.

The garage owner, William E. Eiler, who lost his towing license in the ensuing investigation, is a friend of several once-powerful Democratic politicians and former police officers, including Ellison W. Ensor, the former chief.

Mr. Ensor retired September 1 amid the investigation into corruption charges within the 1,180-member police force.

Mr. Gallen was then named acting chief by Theodore G. Venetoulis, the county executive, with orders to pursue the probe. Subsequently, Mr. Gallen received the permanent appointment as chief.

Several high-ranking officers closely identified with the former chief also have subsequently retired. They include:

*Col. Gordon C. Lee, the former operations officer, who had custody of the licensing files for towing operators.

*Maj. Louis G. Roemer, the former chief of detectives and also a friend of Mr. Eiler.

*Maj. Frank Hohman, former head of the Traffic Division, who kept the complaint files on towing operators.

*Capt. Charles L. Krach, former commander of the Eastern Patrol Bureau, who was responsible for

drawing the towing zone boundaries in the Essex area.

These four officers, as well as Chief Ensor, were among those charged with 'nonfeasance,' according to a reliable source.

Colonel Lee and Major Hohman were named in one section of the report which described the 'poor record-keeping system' within the department relating to towing operators.

Police investigators also faulted the county Department of Permits and Licenses for 'sloppy record keeping' relating to towing and suggested that 'effective internal management procedures be adopted.'

The report also referred to one unidentified towing operator who 'may have committed several violations of law' other than the county towing statute and who is under investigation for possible criminal indictment by the state's attorney.

At the conclusion of the report, Chief Gallen spelled out a new licensing procedure he has implemented, which will include at least three inspections a year of the county's approximately 31 police-licensed towing companies."

Appellant, at trial, claimed that this article falsely accused him of having been charged with a crime (nonfeasance) and that he had been damaged in his good name and reputation, particularly his reputation as a former law enforcement officer and as a former county employee of honesty and integrity.

Appellee successfully maintained below, that the article was not defamatory and that, even if it were, there was no evidence of actual malice sufficient for the jury to consider whether appellee's constitutional privilege had been overcome.[1] *New York Times v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964).

---

1. Appellant proceeded below upon the theory that he was a "public figure" within the meaning of New York Times v. Sullivan, *supra.*

The trial judge, in granting appellee's motion for a directed verdict at the close of all the evidence, concluded that the article was not defamatory since, in the context of the entire article, the allegedly libelous paragraph, "These four officers (referring to appellant and three others), as well as Chief Ensor, were among those charged with 'nonfeasance,' according to a reliable source", did not charge appellant with a crime. The trial court arrived at this conclusion based upon two statements in the article which precede the offending paragraph. Those statements are as follows:

> "Although the report finds no evidence of criminal misconduct by current or former policemen . . ."

> "Sandra A. O'Connor, the state's attorney, will use the findings in her own probe of the department and the towing industry. She has said this investigation will be a top priority of the new grand jury sworn in last week."

The threshold question of whether an article is defamatory is one of law to be determined by the court. The trial court correctly considered the article in its entirety, *Heath v. Hughes,* 233 Md. 458, 464, 197 A.2d 104 (1964); *see Bowie v. Evening News,* 148 Md. 569, 574, 129 A. 797 (1925); *Flaks v. Clark,* 143 Md. 377, 382, 122 A. 383 (1923). The Court of Appeals in *Flaks v. Clark, supra,* stated well the rule applied by the trial court:

> ". . . [T]he libelous character of the article must be determined from the *whole article* published. . . .

> Words may have different meanings according to the connection in which they are used, and their context may confine them to but a single and innocent construction. It would be a dangerous doctrine, and tend to promote grave injustice, to permit words to be withdrawn from others with which they are connected and used by the publisher, and then impute to them a meaning not warranted by the whole publication." [Emphasis in original.]

*Id.* at 382. The two preceding statements in the article, which relate that the investigative report found no evidence of *criminal* misconduct by former policemen and that the state's attorney "will use" the findings from the report in her own probe, could be viewed as negating an inference that appellee was ascribing to appellant the commission of a crime. Nevertheless, we disagree with the trial court that, as a matter of law, the article was not defamatory although we conclude the case was properly withheld from the jury. We say this because it could be inferred that the author of the article was dealing with two separate sources: one, Chief Gallen's report, and another being "a reliable source". Thus, while the report itself may have stated there was no evidence of criminal misconduct, it could be inferred that a "reliable source" said appellant and three others were "charged with nonfeasance", an admitted crime. In our view, keeping in mind the standard to be used by a trial judge in ruling on a motion for a directed verdict, reasonable readers of the article could have concluded appellant was said to have been charged with the commission of a crime. The trial judge, it seems to us, recognized his function when he stated in his oral opinion granting the motion:

> "If there were legally sufficient evidence that this publication charged the plaintiff with the commission of a crime in the sense that it's argued by Major Hohman, then I'd let the jury consider damages. If the statement was reasonably capable of two different meanings as Major Hohman's counsel argued, I should let the jury decide whether it's defamatory or not. If the statement is capable of two different meanings."

Nevertheless, we believe the trial judge was wrong when he then concluded the statement was capable of only one meaning. Normally this conclusion on our part would require reversal, but not here because we do not believe there was evidence of actual malice, an element necessary to be shown under these circumstances.

## Malice

Appellee argues that the lack of sufficient evidence of actual malice would also preclude submission of the issue of whether the newspaper's constitutional privilege had been overcome. The trial court did not base its decision to grant the motion for directed verdict specifically upon any failure on appellant's part to produce evidence of actual malice. The trial judge stated:

> "I don't need to really base my ruling on that argument because I find that the evidence is legally insufficient to meet the burden of proof on the plaintiff to go to the jury."

Our recent decision in *Delia v. Berkey,*[2] 41 Md. App. 47, 395 A.2d 1189 (1978), denominates appellant a public official since the offending statement appears in a newspaper article which mentions him in his capacity as a Baltimore County police officer. *Id.* at 51. Judge Liss, writing for this Court in *Delia v. Berkey, supra,* engaged in a thorough examination of the standard of proof of malice required of a public official under *New York Times v. Sullivan, supra:*

> "Accordingly, the test applied in determining the governing legal principles in this case [involving a police officer acting within the scope of his law enforcement function] is the standard enunciated by the Supreme Court of the United States in *New York Times v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710 (1964), which held that public officials may sue for libel only when they can demonstrate that the alleged libel was made with 'actual malice,' which is defined to mean publication of false statements with actual knowledge of their falsity or with reckless disregard for their truth or falsity. In *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S. Ct. 209 (1964), the Court refined its standard, stating that 'only those false statements made with the high degree of awareness of their probable falsity demanded by *New York*

2. Certiorari to Court of Appeals granted March 28, 1979.

*Times* may be the subject of either civil or criminal sanctions.'

*New York Times, supra,* and its progeny impose a heavy burden on the public official or public figure who seeks redress for an alleged defamation. The defamed public official or public figure must prove not only that the circulation was false but that it was knowingly so or was circulated with reckless disregard for truth or falsity. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S. Ct. 1029 (1975). The procedural effect of New York Times was a shifting of the burden of proof in cases involving alleged defamation of public officials or public figures. We said in *Kapiloff v. Dunn,* 27 Md. App. 514, 530, 343 A.2d 251 (1975):

> In order to protect the interest of the First Amendment in the free dissemination of information concerning the conduct of a public official or public figure, the Supreme Court shifted that burden. It is now incumbent upon the public official or public figure plaintiff to prove that the statements concerning his conduct were false, and that they were published with actual malice.

> The New York Times or the so called 'constitutional malice' doctrine focuses primarily on the element of scienter. Knowing falsity or reckless disregard for truth involves proof of a 'high degree of awareness of . . . probable falsity . . .,' *Garrison v. Louisiana, supra,* such that the defendant 'entertained serious doubts as to the truth of his public action.' *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S. Ct. 1323 (1968). *Accord, Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978)."

*Id.* at 51-53. To prove "reckless disregard", as required by *New York Times v. Sullivan, supra,* appellant had to adduce sufficient evidence to permit the conclusion that appellee in fact entertained serious doubts as to the truth of the

publication. *See St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968), where the Court stated:

"These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."* [Emphasis added.]

There is simply no evidence that appellee published the article with "knowing falsity" or "reckless disregard of the truth".

Our review of the record persuades us that appellant failed to meet the heavy burden placed upon him by *New York Times v. Sullivan, supra,* in producing sufficient evidence of actual malice to take the matter to the jury.

The *Sun* reporter's testimony negates any inference that he entertained any serious doubts about the truth of the matters treated in the article, particularly the allegedly defamatory statement. The reporter included the name of appellant among those to whom the nine-page report referred when it stated, "There was evidence of non-feasance by ranking police officers who are no longer with the police department", for the following reasons: the language of the report, *i.e.,* "ranking police officers"; the reference made by the report to the poor record-keeping within the police department, and the confirmation by a "reliable source" that the names that were to appear in the article were the "ranking officers" mentioned in the report. The investigative report itself did not give the names of the officers, so the reporter resorted to the sources noted previously to garner the information for the January 22, 1976 article. The reporter's recitation of his investigation to determine the names of those "ranking police officers" contains no hint, nor is there any other evidence, that appellee or its reporter entertained any doubts, much less serious doubts, as to the truth of the publication. Thus we are led to the inescapable conclusion that

appellant failed to offer evidence of actual malice, and the motion for directed verdict was properly granted upon this ground.

*Judgment affirmed.*
*Costs to be paid by appellant.*