The motion for judgment of acquittal and the motions for new trial will be denied.

**ORDER**

For the reasons given in the foregoing Memorandum, it is hereby

**ORDERED** that defendant Esther Koenig's motion for judgment of acquittal is **DENIED;** and it is further

**ORDERED** that both defendants' motions for a new trial are **DENIED.**

**Sharon MATES, Plaintiff,**

**v.**

**NORTH AMERICAN VACCINE, INC., et al., Defendants.**

**No. Civ.A. AW98–3678.**

United States District Court, D. Maryland, Southern Division.

June 18, 1999.

**5.** The Court gave the following instruction.

**Defendant's Right Not to Testify**

The defendants William Koenig and Esther Koenig did not testify in this case. Under our constitution, they have no obligation to testify or to present any other evidence because it is the prosecution's burden to prove the defendant guilty beyond a reasonable doubt. The burden remains with the prosecution throughout the entire trial. It never shifts to the defendant. Each defendant is not required, never required to prove that he or she is not guilty. You may not attach any significance to the fact that a defendant did not testify. No inference of any kind may be drawn by you because they did not take the witness stand. You may not consider this against either or both of the defendants in any way in your deliberations in the jury room.

The law never imposes upon the defendant in a criminal case such as this the burden of calling any witness or producing any evidence.

Vol. III at 136–37. *See* 15.14 DEVITT, BLACKMAR & O'MALLEY, FEDERAL JURY PRACTICE INSTRUCTIONS (4th Ed.1990).

817

Jonathan M. Jacobs, Daniel E. Loeb, and Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., for plaintiff.

Timothy F. Maloney, and Joseph, Greenwald and Laake, Greenbelt, Maryland, and Stephen H. Sachs, and Wilmer, Cutler and Pickering, Washington, D.C. for defendant North American Vaccine, Inc.

David Clarke, Jr., and Piper & Marbury, Washington, D.C., and Eugene E. Stearns, Bradford Swing, and Stearns Weaver Miller Weissler Alhadeff & Sitterson, Miami, FL, for defendant Phillip Frost, M.D.

Thomas D. Yannucci, Kevin Michael Loftus, and Kirkland & Ellis, Washington, D.C. for defendants Francesco Bellini, Ph.D. and BioChem Pharma, Inc.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Pending before the Court are four motions to dismiss filed by each of the four defendants. Plaintiff has responded with a consolidated opposition to the motions, and each of the defendants replied accordingly. A hearing was held on May 3, 1999. Following the hearing, Plaintiff filed a First Amended Complaint to add a count for breach of contract against Defendant North American Vaccine, Inc. Before disposition of the aforementioned motions, the Court directed the defendants to answer, or otherwise respond to, Plaintiff's First Amended Complaint. Accordingly, all four defendants filed motions to dismiss the First Amended Complaint, which are now before the Court.[1] No other hearing is deemed necessary. Local Rule 105.6 (D.Md.). For the reasons set forth below, the Court will grant each defendant's motion to dismiss the First Amended Complaint.

## BACKGROUND

Plaintiff Dr. Sharon Mates, a Maryland resident, was the former director and president of Defendant North American Vaccine, Inc. ("NAVI"). NAVI is a publicly held Canadian corporation involved in the research, development, production, and sales of vaccines for the prevention of human diseases.[2] Mates was the director and president of NAVI from its inception in 1989 until 1998, when she was removed from the board of directors and then terminated from her employment. Mates brings this action against Defendants NAVI, Dr. Phillip Frost[3], BioChem Pharma, Inc. ("BioChem")[4], and Dr. Francesco Bellini[5], alleging violations of federal securities laws and the Canadian Business Corporations Act. Mates also has brought Maryland common law claims based on alleged incidents arising out of her removal from the board and subsequent termination.

Incorporated in Canada in 1989, NAVI began its operations in the United States in 1990. It is one of only five companies that the Food and Drug Administration ("FDA") has licensed to sell pediatric vaccines in the United States. The first eight years of NAVI's operations in the U.S., however, were spent trying to obtain FDA approval of its commercial product, CERTIVA. CERTIVA is an active immunization against diphtheria, tetanus and pertussis (whooping cough) in infants and children six weeks to seven years of age. NAVI expected that once CERTIVA was approved, the company would immediately experience dramatic financial growth and enjoy a substantial share of the pediatric vaccine market. However, CERTIVA's approval in the summer of 1998 came too late. The significant delay in the approval process caused potential investors to divest, and consequently NAVI's share price

---

1. Although North American Vaccine, Inc. styled its motion as a "Further Response in Support of its Motion to Dismiss," it is tantamount to a motion to dismiss the First Amended Complaint, and will be treated as such by the Court. Further, because the First Amended Complaint was filed before the disposition of the motions to dismiss the original Complaint, these motions will be denied as moot. However, the Court will incorporate the memoranda and appendices filed in support of the defendants' initial motions to dismiss into the pending motions to dismiss the First Amended Complaint.

2. NAVI's principal place of business and corporate headquarters are in Columbia, Maryland.

3. Dr. Frost, a Florida resident, is the former vice-chairman of NAVI, and shareholder of 17% of NAVI's stock.

4. BioChem is a publicly held Canadian corporation involved in the research and development of products for the prevention, detection and treatment of human diseases. Its principal place of business and headquarters are in Laval, Quebec, Canada. BioChem also holds 39% of NAVI's stock.

5. Dr. Bellini, a Canadian resident, is the CEO, director, and a major shareholder of BioChem. He is also a member of NAVI's board of directors.

dropped significantly.[6] It was at this time that Mates alleges that Defendants Frost, Bellini, and BioChem secretly decided to acquire a controlling interest in NAVI in order to sell it.

In her First Amended Complaint, Mates claims that Frost and Bellini engaged in a scheme to increase Frost's and BioChem's ownership interest and control of NAVI through insider transactions. Mates alleges that this secret plan involved a "sweetheart" deal in which Frost and BioChem provided $25 million in needed financing to NAVI in exchange for convertible debentures. Mates claims that the conversion price of these debentures was approximately three dollars less than the then closing price of the stock on the day the deal was considered.[7] Thus, Mates argues that Frost and BioChem stood to make a considerable profit due to the significantly low price that the debentures were sold in relation to its then higher selling price.

The gravamen of the complaint, however, concerns the Defendants' alleged efforts to keep Mates from the details of the financing deal. Mates claims that "[b]ecause the proposed financing involved [NAVI] insiders and terms unfavorable to [NAVI]," Defendants excluded her from board meetings and discussions concerning the proposed deal, despite her being NAVI's president and ranking member of its board of directors. Mates further claims that when the financing deal was to be voted upon by NAVI's board of directors, she was not notified of the meeting, and as such was not given an opportunity to participate. Consequently, Mates alleges that the financing deal between Frost and BioChem, and NAVI was approved without her consent.

In addition, on the day the financing deal was approved, Mates was told by a member of the board that one of the conditions of the deal was that she resign, or be terminated, from the company. Because Mates refused to resign, the board of directors immediately terminated her. The very next day, NAVI issued a press release announcing the board's approval of the $25 million financing deal, and that Mates would be replaced as president of NAVI. Mates then filed this action.

Although Mates has accused Defendants of corporate improprieties and federal securities laws violations, she has brought this action in her individual capacity, and not derivatively as a NAVI shareholder.[8] In her eleven-count First Amended Complaint, Mates seeks to compel Frost and BioChem, pursuant to Section 13(d) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78m et seq., and Rule 13d–1, promulgated thereunder, to make the required public disclosures of their alleged intention to sell NAVI. Against NAVI, Mates seeks to enforce her rights as a board member to be given notice of and access to board meetings, and the books and records of NAVI. She also requests that the Court enjoin NAVI from taking steps to effectuate the financing of the alleged insider, secret deal. Finally, with regard to her termination, Mates has filed a claim for abusive discharge, and seeks declaratory relief against NAVI for its alleged vote to terminate her, which she claims was contrary to NAVI's bylaws and the Canadian Business Corporations Act ("CBCA"). She also has filed a claim for defamation against NAVI for publishing on its Internet website that she had been removed from the board, and a claim for tortious interference with business relations against Frost, Bellini, and BioChem.

## DISCUSSION

### I. *Personal Jurisdiction*

██ As a threshold matter, the Court must first determine whether it has personal jurisdiction over the Defendants.

---

6. NAVI's shares are traded on the American Stock Exchange ("AMEX").

7. Mates maintains that while the closing price of the stock was $11.25 per share on Septem-

ber 23, 1998, the Defendants' negotiated conversion price was $8.35 per share.

8. Dr. Mates does, however, own shares of NAVI stock.

Other than NAVI, Defendants Frost, Bellini, and BioChem are not residents of the State of Maryland, and each has argued that they do not have sufficient contacts with the state so as to confer personal jurisdiction over them. As such, the burden is on Mates to prove that the Court may exercise jurisdiction over the nonresident Defendants. *See Baker & Kerr, Inc. v. Brennan*, 26 F.Supp.2d 767, 769 (D.Md. 1998). However, when the Court rules on a motion to dismiss for lack of personal jurisdiction without the benefit of an evidentiary hearing, the plaintiff's burden is " 'simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge.' " *Owens–Illinois, Inc. v. Rapid American Corp.*, 124 F.3d 619, 628 (4th Cir.1997) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989)). Mates, however, does have the benefit of having all relevant pleadings and inferences construed in her favor. *Id.*

With regard to the claims brought against Frost and BioChem under Section 13(d) of the Securities Exchange Act of 1934, Section 27, of the same act, grants federal courts jurisdiction and provides for venue and service of process. 15 U.S.C. § 78aa; *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 577, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). Section 27 provides, in relevant part:

> Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district (wherein any act or transaction constituting the violation occurred) or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

(Emphasis Supplied).

■ Although Section 27 has been construed as permitting nationwide service of process in any district in which the defendant is found, *see Securities Investor Protection v. Vigman*, 764 F.2d 1309, 1315 (9th Cir.1985), it still must not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). However, the relevant question under Section 27 becomes whether the party has sufficient contacts with the United States, not any particular state. *See Securities Investor Protection Corp.*, 764 F.2d at 1315; *Fitzsimmons v. Barton*, 589 F.2d 330, 333 (7th Cir.1979); *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974). Thus, this Court can exercise personal jurisdiction over the Defendants if it is found that they have minimum contacts with the United States.

While Frost's and BioChem's contacts with Maryland may be lacking, it is clear that they each have significant contacts with the United States. Frost is a resident of the State of Florida, and BioChem owns 13 U.S. patents, has sought approval from the FDA for several of its commercial products, is listed on the National Association of Securities Dealers Automated Quotations (NASDAQ), and has engaged in numerous contractual agreements with NAVI. *See* Pl.'s Opp. at 24–26 and exhibits attached thereto. Thus, Frost and BioChem have purposefully availed themselves of the privilege of conducting activities in the United States. *See e.g. Mariash*, 496 F.2d at 1143 (where the defendants reside within the territorial boundaries of the United States, the "minimum contacts," required to justify the court's exercise of power over them, are present); *MTC Electronic Technologies Co., Ltd. v. Leung*, 889 F.Supp. 396, 400 (C.D.Ca.1995) (Canadian brokerage house had minimum contacts within United States to support exercise of jurisdiction under Securities Exchange Act where foreign defendant certified certificates, and rendered shares negotiable in United

States via the NASDAQ exchange in New York.).

■ As for Bellini, personal jurisdiction is not as clear. Bellini is a Canadian resident, and the only contacts that are claimed that he has with Maryland is by way of his position as a member of NAVI's board of directors, and as CEO of Bio-Chem.[9] However, despite Bellini being a board member of NAVI, if his only contact with the forum state was entirely within the scope of his corporate capacity, he cannot be subjected to this Court's jurisdiction. *See Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984) (individual's contacts with forum state are not to be judged according to their employer's activities there, but rather their contacts with the forum state must be assessed individually); *Overseas Partners, Inc. v. PROGEN Musavirlik ve Yonetim Hizmetleri, Ltd. Sikerti*, 15 F.Supp.2d 47, 51 (D.D.C.1998) (personal jurisdiction over officers of corporation in their individual capacities must be based on their personal contacts with forum, not their acts and contacts carried out solely in corporate capacity); *Birrane v. Master Collectors, Inc.*, 738 F.Supp. 167, 169–70 (D.Md.1990) (corporate officer who has chosen simply to transact business in a state through a valid and viable corporation has not necessarily purposefully availed himself of the privilege of conducting activities within the state in his individual capacity) (citation omitted). Moreover, jurisdiction over Bellini, as an officer of BioChem, cannot be predicated solely upon this Court's jurisdiction over BioChem itself. *See Birrane*, 738 F.Supp. at 169 (absent grounds warranting the court piercing the corporate veil, there is no basis whatsoever for exercising personal jurisdiction over corporate officer whose only contacts are via corporate activities in state). Thus, as there has been no allegations, or evidence tending to support such

an allegation, that Bellini has sufficient minimum contacts with the state of Maryland to support this Court's exercise of in personam jurisdiction, all claims against Bellini must be dismissed without prejudice.

■ Finally, although the Court has jurisdiction with respect to the federal securities laws claims over Frost and Bio-Chem, Mates has also brought a pendent state law claim for tortious interference with business relations against them. The Court, however, cannot independently exercise personal jurisdiction over Frost and BioChem with regard to this claim. Nevertheless, the Court may assert its pendent jurisdiction on the grounds that it has in personam jurisdiction over them vis-a-vis the federal securities laws claims. *See Robinson v. Penn Central Company*, 484 F.2d 553, 555 (3d Cir.1973). Pendent personal jurisdiction typically is invoked in cases where the exclusive basis for personal jurisdiction is the presence of a federal claim that provides for extra-territorial service of process. *See, e.g., Oetiker v. Werke*, 556 F.2d 1 (D.C.Cir.1977); *Robinson*, 484 F.2d at 555. As the court in *Robinson* explained:

> Once the defendant is before the court, it matters little, from the point of view of procedural due process, that he has become subject to the court's ultimate judgment as a result of territorial or extraterritorial process. Looked at from this standpoint, the issue is not one of territorial in personam jurisdiction— that has already been answered by the statutes—but of subject matter jurisdiction. It is merely an aspect of the basic pendent jurisdiction problem.

484 F.2d at 555. Thus, as Frost and Bio-Chem are properly before the Court pursuant to the Securities Exchange Act, personal jurisdiction may be exercised over them with regard to the pendent state claim.

9. The only claim that Mates has brought against Bellini is for tortious interference with business relations (Count Nine).

## II. *Standard of Review for Motion to Dismiss*

It is well established that a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). However, the function of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint, and not the facts that support it. *See Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989). Thus, a complaint may be dismissed as a matter of law if it lacks a cognizable legal theory, or it alleges insufficient facts under a cognizable legal theory. *See Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir. 1984) (citing 2A J. Moore, Moore's Federal Practice ¶ 12.08 at 2271 (2d ed.1982)). In determining whether to dismiss the First Amended Complaint, this Court must view the well-pleaded material allegations in a light most favorable to the plaintiff, with the alleged facts accepted as true. *See Chisolm v. TranSouth Financial Corp.,* 95 F.3d 331, 334 (4th Cir.1996); *see also* 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d, § 1357, at 304–21 (1990).

Where securities laws violations are alleged, motions to dismiss are subject to stricter standards because whether a statement or omission is false or misleading to the investing public "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976); *see also* 15 U.S.C. § 78u–4(b)(1) (requiring plaintiff to specify with particularity in the complaint any statement or omission giving rise to private securities litigation). Thus, "only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir.1995); *see also Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970).

This heightened pleading requirement is also designed to filter out frivolous cases and prevent plaintiffs from using "conclusory generalizations ... to set off on a long and expensive discovery process in the hope of uncovering some sort of wrongdoing or of obtaining a substantial settlement." *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 116 (2d Cir.1982). Accordingly, courts have not been hesitant to dismiss securities fraud complaints on findings of insufficient allegations of fraudulent intent. *See, e.g., Thornton v. Micrografx, Inc.,* 878 F.Supp. 931 (N.D.Tex. 1995); *Kriendler v. Chemical Waste Mgmt., Inc.,* 877 F.Supp. 1140 (D.C.Ill. 1995); *Sheldon Co. Profit Sharing Plan and Trust v. Smith,* 828 F.Supp. 1262 (W.D.Mich.1993); *Gordon v. Diagnostek, Inc.,* 812 F.Supp. 57 (E.D.Pa.1993); *Martin v. Pepsi–Cola Bottling Co.,* 639 F.Supp. 931 (D.Md.1986); *see also In re Cryomedical Sciences, Inc. Securities Litigation,* 884 F.Supp. 1001 (D.Md.1995); *Tischler v. Baltimore Bancorp,* 801 F.Supp. 1493 (D.Md.1992). While fraud is not necessarily an element of Section 13(d), Mates nonetheless has alleged that the Defendants have acted with fraudulent intent. In fact, the essence of the entire complaint concerns Defendants' alleged scheme to negotiate a secret financing deal that amounted to an insider transaction, file misleading documents with the SEC, and make use of a "sham vote" to remove Mates from her position on the board of directors. Thus, it is clear that fraud lies at the core of her action. As such, Rule 9(b) of the Federal Rules of Civil Procedure applies to her claims of federal securities laws violations. *See* Fed.R.Civ.P. 9(b) (applying to "all"

averments of fraud); *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994) (holding that Rule 9(b) applies to §§ 11 and 12(a)(2) under the Act, despite fraud not being an element, since they are "grounded" in fraud); *Hershey v. MNC Financial, Inc.,* 774 F.Supp. 367, 374–75 (D.Md.1991) (holding that particularity requirement under Rule 9(b) for allegations of fraud applied to claims by shareholders under federal securities laws for false registration statements and false prospectus, even though such provisions do not contain scienter requirement, but where "gist" of claims involved fraudulent scheme.).

Rule 9(b) provides that "in all averments of fraud and mistake, the circumstances constituting the fraud or mistake shall be pleaded with particularity." Mere conclusory allegations of fraud are insufficient. This is intended to "safeguard[ ] defendant's reputation and goodwill from improvident charges of wrongdoing," as well as to "afford the defendant fair notice of plaintiff's claim and the factual ground upon which it is based." *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990). Thus, Mates' allegations must be specific enough "to afford [Defendants] fair notice of [her] claims and the factual grounds upon which it is based." *Id.*

### III. *Federal Securities Laws Violations*

■ Mates has brought two counts for alleged violations of Section 13(d) of the Securities Exchange Act of 1934 against both Frost and BioChem. Count One seeks declaratory relief, and Count Two seeks injunctive relief. While Defendants have filed separate motions to dismiss, the substance of their arguments in support of their dismissal of these two counts are virtually identical. First, Defendants assert that there is no right to a private cause of action under Section 13(d). Second, Defendants argue, in the alternative, that if the Court does recognize that a private cause of action exists, Mates, in her individual capacity, does not have standing to bring such action. The Court will address both motions together.

Section 13(d) requires any person who beneficially owns or acquires 5% or more of a class of stock registered under Section 12 of the Act to file with the Securities and Exchange Commission ("SEC"), and send to the issuer and appropriate stock exchange, a statement with respect to such ownership within ten days of acquisition. This provision also requires the person to mail to the target corporation, a Schedule 13D disclosing: (1) the identities and background of the purchasers; (2) their purposes in acquiring the stock; (3) the sources of their financing; (4) the extent of their acquisitions; (5) any arrangement or contracts with other persons concerning the stock, and; (6) any other material information. *See Dan River, Inc. v. Unitex Ltd.,* 624 F.2d 1216, 1218 (4th Cir.1980) (citing 17 C.F.R. § 240.13d–1, et seq. (1978)).

Section 13(d) is derived from the Williams Act, which was passed in 1968 and subsequently amended in 1970 and 1977. Section 13 was enacted in response to the proliferation of the use of cash tender offers in hostile corporate takeovers. *See Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977); *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). The primary objective and impetus for Congress enacting this provision was to insure that the investing public was provided full and fair disclosure and access to all pertinent information regarding any attempt to obtain control of a corporation by a cash tender offer or privately negotiated securities offer. *Id.* at 26, 97 S.Ct. at 942. Congress believed that Section 13(d) would level the playing field between the shareholder/investor, the tender offeror, and the existing management of the target corporation. However, despite Congress's efforts to protect the shareholder and potential investor with Section 13(d), it failed to explicitly provide for a private right of

action to enforce the provision. It is this fact that Defendants rely upon in support of their motions to dismiss.

While it is clear that no portion of Section 13 explicitly provides for a private right of action by any person, numerous courts have implied, or assumed without discussion, that such a right exists under certain circumstances. *See e.g. GAF v. Milstein*, 453 F.2d 709 (2d Cir.1971) (explicitly recognizing an implied private right of action); *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207 (2d Cir.1973) (same); *Scott v. Multi–Amp Corp.*, 386 F.Supp. 44 (D.N.J.1974) (same); *Rosenbaum v. Klein*, 547 F.Supp. 586 (E.D.Pa. 1982) (recognizing in dicta); *Citizens First Bancorp, Inc. v. Harreld*, 559 F.Supp. 867 (W.D.Ky.1982) (assumed without discussion); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156 (9th Cir.1992) (same); *Oklahoma Pub. Co. v. Standard Metals Corp.*, 541 F.Supp. 1109 (W.D.Okla.1982) (same); *but see Leff v. CIP Corp.*, 540 F.Supp. 857 (S.D.Ohio 1982) (holding that there is no private right of action for any person under § 13(d)); *Atlantic Fed. Sav. & Loan Assoc. v. Dade Sav. & Loan Assoc.*, 592 F.Supp. 1089 (S.D.Fla.1984) (holding that issuer and shareholder had no right to bring an action for equitable relief under § 13(d)); *Gateway Industries v. Agency Rent–A–Car*, 495 F.Supp. 92 (N.D.Ill.1980) (same); *Sta–Rite Industries, Inc. v. Nortek, Inc.*, 494 F.Supp. 358 (E.D.Wis.1980) (same). For instance, in *Dan River, Inc. v. Unitex, Ltd.*, the Fourth Circuit held that a target corporation, the "issuer" of the stock, has a private right of action for injunctive relief against violations of Section 13(d), including violations caused by the filing of documents containing false or misleading statements. 624 F.2d 1216,

1224 (4th Cir.1980). Therein, the plaintiff target corporation brought an action for injunctive, declaratory, and other equitable relief against the purchaser of more than 5% of its stock. The plaintiff claimed, as Mates has done here, that the defendant provided incomplete and misleading statements in its 13D disclosure schedule. *Id.* at 1219. Assuming without any discussion that Section 13(d) implicitly provides for a private right of action, the Fourth Circuit addressed whether a target corporation had standing to maintain such an action. *Id.* at 1222. Contrary to the defendant's assertion that "section 13(d) was enacted for the sole benefit of stockholders and not to provide 'armament' to management in resisting takeovers or accumulations of the stock of corporation," *id.*, the *Dan River* court held that a target corporation has a right to injunctive relief until such time as the filed documents accurately reflect the intentions of the filing parties. *Id.* at 1229. The court found most persuasive the reasoning of those courts that concluded that "the obligation to file truthful statements is implicit in the obligation to file with the issuer, and *a fortiori*, the issuer has standing under section 13(d) to seek relief in the event of a false filing." *Id.* at 1223 (citing *GAF v. Milstein*, 453 F.2d at 720).

While the decision in *Dan River* suggests that the Fourth Circuit is willing to read, at least in some instances, an implicit private right of action under Section 13(d), it does not answer the more difficult question presented in this case of whether Mates, in her individual capacity as a former director, has standing to maintain this action.[10] Moreover, there are no other Fourth Circuit decisions that have specifically addressed whether a former board

---

**10.** Mates argues, however, that *Dan River* does confer her standing to bring an action under Section 13(d). Mates references language in the *Dan River* opinion that she claims was intended to provide anyone seeking to correct inaccurate filings standing to bring an action. Therein, the court wrote, "a court cannot simply turn a blind eye to a potentially inaccurate filing when it possesses

the injunctive power to have that filing corrected before irreparable harm occurs to the investing public." 624 F.2d at 1227. However, this Court is not willing to read *Dan River* that broadly. The Fourth Circuit's opinion was clear in that it was only considering whether a target corporation had standing to bring an action under Section 13. *Id.* at 1222.

member can maintain a private action under Section 13(d). Thus, the Court must look to decisions in other circuits for guidance.

There are a paucity of cases that have dealt squarely with the issue before this Court. However, the decision in *Nowling v. Aero Services International*, 752 F.Supp. 1304 (E.D.La.1990) is illustrative, if not on point. In *Nowling*, a former CEO and president filed a third-party complaint against the board of directors. In his complaint, the former board member brought some of the same counts as Mates has here, i.e. breach of fiduciary duty, interference with economic opportunity, and various violations of Section 13(d). *Id.* at 1308. With regard to the Section 13(d) violations, the third-party plaintiff claimed that a major shareholder, who had acquired well over 5% of the corporation's stock, filed a misleading Schedule 13D. *Id.* He alleged that the Schedule 13D information was misleading because it led him to believe that the third-party defendant had intended to sell the corporation, but in fact had no such intention. *Id.* at 1312. As a threshold matter, the *Nowling* court had to determine if the third-party plaintiff had standing to even bring a private action for violation of Section 13(d). *Id.* In so doing, the court recognized that shareholders in general are entitled to injunctive relief to correct violations of Section 13(d), but held that the former president and CEO of the issuer had no standing to bring such an action. *Id.* at 1313. The *Nowling* court determined that Congress's purpose in enacting Section 13(d) "was not to favor management or its adversaries but to insure that the share owning public, confronted by a cash tender for their stock, would have adequate information about the qualifications and intentions of the offering party before responding to the offer." *Id.* (citations omitted). Thus, since the third-party plaintiff was a member of the board of directors of the issuer when the tender offer had been made and he had access to all of the pertinent information, the court concluded that he was not an ordinary shareholder whose interests were intended to be protected by Section 13(d). *Id.*

The Court finds the reasoning and decision in *Nowling* to be sound. Although Mates has attempted to distinguish herself from the third-party plaintiff in *Nowling* on the grounds that she allegedly did not have access to all of the pertinent information regarding the financing deal and that she was prevented from exercising her rights as a board member [11], the Court is not persuaded. The First Amended Complaint indicates that Mates was well aware of the details of the financing deal prior to it being approved. In fact, Mates was present at the meeting where the deal was discussed and voted upon it. *See* First Am.Compl., ¶¶ 18–27.

Moreover, the Court must bear in mind the gravamen of Mates' First Amended Complaint, in which she brings this action in her individual capacity as a former board member, and not as a shareholder. The legislative history of Section 13(d) clearly evidences Congress's principal concern in designing the legislation was protecting unsuspecting investors, and not well-informed members of management who can adequately protect their own interests. *See Piper*, 430 U.S. at 28–29, 97 S.Ct. at 942–43 (providing comprehensive review of legislative history). Thus, as the *Nowling* court wrote,

Section 13(d) was not designed to protect ex-presidents or ex-board members who want to get back at their previous co-fiduciaries for disagreements or squabbles lost along the way. The Williams Act was meant to be neutral and the draftsmen took extreme care to

---

11. Mates alleges that she was kept out of and asked to leave board meetings, not notified of meetings, denied access to the company's books and records, and removed from the board of directors in contravention of the corporate by-laws. *See* First Am.Compl. ¶¶ 17, 29, 30, and 31.

avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid.

752 F.Supp. at 1313. Accordingly, the Court finds that Mates, in her individual capacity as a former board member, does not have standing to bring a private action for alleged violations of Section 13(d) of the Securities Exchange Act of 1934. Thus, both Frost's and BioChem's motions to dismiss will be granted as to Counts One and Two.

## IV. *Technical Violations of the Canadian Business Corporations Act*

■ As an initial matter, Mates advised the Court at the hearing that she has "withdrawn" Count Three ("Against NAVI for Declaratory Relief Regarding the Purported Approval of the Financing"), Count Four ("Against NAVI for Injunctive Relief to Enjoin the Company From Taking Steps to Effectuate the Financing"), Count Five ("Against NAVI for Injunctive Relief to Enjoin the Company from Continuing to Deny Plaintiff Access to the Company's Books and Records"), and Count Six ("Against NAVI for Injunctive Relief to Enjoin the Company from Continuing to Deny Plaintiff Access to Board Meetings"). Thus, Count Seven is the only remaining claim that has been brought under the Canadian Business Corporations Act.

However, Count Seven ("Against NAVI for Declaratory Relief Regarding the Purported Termination of Dr. Mates") became moot on February 23, 1999 when the newly elected board of directors of NAVI ratified the outgoing board's decision to terminate

Mates. *See e.g. Lucero v. Lujan,* 788 F.Supp. 1180, 1182 (D.N.M.1992); *Kociolek v. Hagmann,* 678 F.Supp. 1, 3 (D.D.C. 1988). Thus, even if Mates' termination was in contravention of the corporate by-laws, the subsequent board's ratification would have retroactive effect, making the ratified action valid as of the original decision date. Accordingly, Count Seven will be dismissed as moot.

## V. *Abusive Discharge*

■ In Count Eight, Mates, who was an at-will employee of NAVI, alleges that her termination by the board of directors for allegedly exercising her fiduciary duties as an officer and director of the company constituted an abusive discharge by NAVI. Mates argues that Frost, Bio-Chem, and Bellini "attempted to hide their financing scheme from Dr. Mates, in an attempt to prevent her from fulfilling her [fiduciary] duties." [12] Pl.'s Opp. at 53–54. Mates further asserts that this was done in order "to remove her as an obstacle to their scheme to obtain [NAVI] stock at a very favorable price and then sell [NAVI]." *Id.* at 54.

■ While an at-will employee may be fired for almost any reason, she may not be fired for a reason that violates a clear mandate of public policy. As such, a wrongful or abusive discharge has been defined as "the willful termination of employment by the employer because of the employee's alleged failure to perform in accordance with the employer's expectations and the termination is contrary to a

---

**12.** Mates' argument is rather confusing with regard to this count. First, although the abusive discharge claim has been filed only against NAVI, all of the allegations speak to the alleged misconduct of Frost, BioChem, and Bellini. *See* Pl.'s Opp. at 53–55. Mates then asserts that Frost, BioChem, and Bellini were "acting ostensibly in the name of [NAVI]," but goes on to argue that they were acting "on behalf of their own self-interest." *Id.* at 53. Mates, however, cannot have it both ways. If she is claiming that Frost, BioChem, and Bellini were acting in their

official capacities as board members, then she may bring this count against NAVI based on agency principles. If she is claiming that Frost, BioChem, and Bellini were acting solely in their own self-interest and outside the scope of their roles as board members, then no liability can be imputed to NAVI. As the parties are before the Court on motions to dismiss, the complaint will be read in the light most favorable to Mates, and as such the Court will assume she is claiming that Frost, BioChem, and Bellini were acting in their official capacities.

clear mandate of public policy." *Allen v. Bethlehem Steel Corp.*, 76 Md.App. 642, 652, 547 A.2d 1105 (1988). Thus, in order to state a claim for wrongful or abusive discharge, the employee must demonstrate: (1) that she was discharged; (2) that the dismissal violated some clear mandate of public policy, and; (3) that there is a nexus between the defendant and the decision to fire the employee. *Moniodis v. Cook*, 64 Md.App. 1, 13–14, 494 A.2d 212 (1985). The employee, however, must allege the policy in question with clarity, specificity, and authority because the " 'recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of the case,' a practice which should be employed sparingly, if at all." *Lee v. Denro*, 91 Md.App. 822, 830, 605 A.2d 1017, 1019 (quotation omitted).

It is clear to the Court that Mates has properly pleaded the first element. However, as to the second, all that she has alleged in her First Amended Complaint is that "[t]here is a clear mandate of [p]ublic policy which requires protection of an employee of a company who seeks to comply and assure compliance with the federal securities laws." First Am.Compl. ¶ 64. Then, in her memorandum in opposition to the motions to dismiss and at the hearing, Mates asserts that NAVI violated two other public policies: (1) the general good faith duty of an officer and director; and (2) general public policy that a company should adhere to federal securities law. Pl.'s Opp. at 55–56. However, these types of vague and general allegations cannot form the basis for the second element of the tort of abusive discharge. *See Adler v. American Standard Corp.*, 291 Md. 31, 44, 432 A.2d 464, 471 (1981) (ruling that allegations about public policy that are "too general, too conclusory, too vague and

lacking in specifics" do not establish a prima facie case). Furthermore, NAVI has the right to terminate an at-will employee if it had grounds to believe she was not doing her job adequately. *Id.* at 42, 432 A.2d 464. Thus, Mates has failed to state a claim for abusive discharge, and NAVI's motion to dismiss will be granted as to this count.

## VI. *Tortious Interference with Business Relations*

■ In Count Nine of her First Amended Complaint, Mates maintains that Frost, Bellini, and BioChem tortiously "engineered [her] termination ... in order to advance their own financial interests" at her expense and the expense of NAVI and its shareholders.[13] *See* First Am.Compl. ¶ 69. Mates claims that as a result of their tortious interference, her business relations with NAVI suffered. Defendants, on the other hand, contend that Mates' claim must be dismissed for two reasons.[14] First, Defendants argue that Mates' claim is legally deficient because it is not asserted against a proper third party, i.e. someone outside the business relationship. Second, Defendants claim that their voting to remove Mates as president of NAVI was not wrongful, but rather a legitimate business decision.

■ In Maryland, a claim of tortious interference with one's business relations can only arise out of the relationship between three parties, the two parties to the contract and the interferer. *See K & K Management, Inc. v. Lee*, 316 Md. 137, 154, 557 A.2d 965, 973 (1989). This equally applies in the instance of an at-will business relationship, like here, where there is no express contract. *Id.* However, unlike the instance where a contract between two parties exists, the right of an individual to

---

13. As the Court has already ruled, the First Amended Complaint has been dismissed against Bellini for lack of personal jurisdiction. Thus, the Court will address this count as to Frost and BioChem only.

14. Again, each defendant has filed a separate motion to dismiss. However, their arguments in support of dismissal are the same. Thus, the Court will address the motions together.

interfere is treated more broadly where no contract exists or the contract is terminable at will. *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69–70, 485 A.2d 663, 674 (1984).

Here, Defendants claim that because they were acting within the scope of their authority as NAVI board members when they voted to remove Mates, they were at all times parties, as agents of NAVI, to the business relationship between Mates and NAVI. Thus, they argue that they cannot be considered third party interferers. Mates claims, however, that when the Defendants sought to remove her from her position on the board, they were not acting as board members, but rather in their individual capacities and motivated by their personal interests in consummating the alleged "insider" transaction. Thus, Mates argues that Defendants were in effect third parties to the business relationship between her and NAVI.

Since the parties are before the Court on motions to dismiss, the Court's sole function is to test the legal sufficiency of the claims in the complaint. *See Neitzke*, 490 U.S. at 326–27, 109 S.Ct. at 1833. As such, Mates has alleged sufficient facts in her complaint to establish that Defendants may have acted out of personal motive and without an intent to further the interests of their corporate principal. *See Miller v. Ratner*, 114 Md.App. 18, 60–61, 688 A.2d 976 (1997). However, this alone does not make for a legally sufficient claim of tortious interference with business relations.

In order to establish a claim, Mates must allege sufficient facts to prove: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in her lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (i.e. "legal malice"); and (4) actual damage and loss resulting. *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962 (1909). The Maryland Court of Appeals has defined intentional and willful

acts necessary to support the tort of interference with economic relations as follows:

> [W]rongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships. Wrongful or unlawful acts include common law torts and "violence or intimidation, defamation, injurious falsehood or other fraud, violations of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith."

*Alexander & Alexander, Inc. v. B. Dixon Evander Assocs., Inc.*, 336 Md. 635, 657, 650 A.2d 260 (1994) (quoting *K & K Management, supra*, 316 Md. at 166, 557 A.2d at 979). Defendants argue that Mates has not alleged that they have committed any intentional or malicious acts, as described by the Court of Appeals in *Alexander & Alexander.* The Court agrees.

The First Amended Complaint is devoid of any such allegations. Mates simply has alleged that: (1) Defendants told her in 1998 that the company's stock was too low, see First Am.Compl. ¶ 16; (2) Frost and BioChem engaged in plan to finance the company that resulted in favorable terms for them, see First Am.Compl. ¶¶ 16, 19, 21, 22; (3) Defendants deceived the NAVI board of directors into believing that Bellini and BioChem's financing offer was the only one made, see First Am.Compl. ¶ 24, and; (4) Defendants stated that the financing deal would not go through if Mates was not terminated, see First Am.Compl. ¶ 27. The Court does not believe that any of these allegations, viewed individually or collectively, are sufficient to make out a cognizable claim for tortious interference. They simply do not rise to the level of conduct that is independently wrongful or unlawful, nor do they constitute "violence or intimidation, defamation, injurious falsehood or other fraud, violations of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Alexander & Alexan-*

der, Inc. v. B. Dixon Evander Assocs., Inc., 336 Md. at 657, 650 A.2d at 260; see also Volcjak v. Washington County Hosp. Ass'n, 124 Md.App. 481, 512, 723 A.2d 463, 479 (Md.Ct.Spec.App.1999) (holding that "[t]ortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim. There must also be proof that the defendant's interference was accomplished through improper means."). Thus, the absence of such conduct is fatal to Mates' suit.

Furthermore, Maryland courts have declined to recognize a mere breach of contract that has an incidental effect on the plaintiff's business relations with third parties as a wrongful act under a claim of tortious interference. See Volcjak, 124 Md.App. at 512–13, 723 A.2d at 479; K & K Management, Inc., 316 Md. at 162–63, 557 A.2d at 978. Here, Mates bases her claim on the grounds that her removal from the board and subsequent termination was in violation of NAVI's corporate by-laws.[15] See First Am.Compl. ¶ 29. Assuming arguendo that the corporate bylaws acted as a contract between the board and the corporation, Mates' claim of tortious interference would be based on nothing more than a breach of contract, which Maryland courts have refused to recognize as a basis for this tort. See Volcjak, 124 Md.App. at 513, 723 A.2d at 479 (holding that where no wrongful conduct by the defendant was alleged, i.e. a breach accompanied by violence, intimidation, defamation, fraud, or other tortious conduct, other than the breach of its contractual obligation under its bylaws, no claim for tortious interference can lie). Accordingly, Mates has failed to a state a claim under Maryland law for tortious interference of business relations. Thus, Frost and Bio-Chem's motions to dismiss will be granted as to Count Nine

## VII. *Defamation*

 Finally, in Count Ten, Mates claims that NAVI defamed her when it published the following press release on its Internet website:

The Company also announced today that Dr. Sharon Mates has been replaced as President of the Company.

In recognition of the Company's emerging needs as an operating company, the Company expects shortly to select a new chief executive officer with proven skill and experience in the industry who will be able to lead the Company in the continued development of its business and operations. Mr. Neil Flanzraich, Chairman of the Board of Directors stated, "The Company is in the final stages of negotiation with a candidate whom the Board believes is particularly well suited to position the Company to compete successfully in the vaccine marketplace and to develop and commercialize new products." Until a new chief executive officer is appointed, the Company has appointed Arthur Y. Elliott, Senior Vice President—Operations and Chief Operating Officer, as acting President.

North American Vaccine, Corporate News, *North American Vaccine Announces $25 Million Financing and Change in Management*, September 24, 1998 Press Release (visited May 14, 1999) <http://www.nava.com/News—Display.asp?id=59 & newsType=All. Mates claims that the statement is defamatory because it insinuates that she does not have proven skill, experience, or an ability to lead NAVI in the continued development of its business operations.

 Under Maryland law, before a claim of defamation can lie, the threshold question of whether a publication is defamatory in and of itself, or whether it can reasonably be capable of a defamatory interpretation in light of the extrinsic facts must be answered by the court upon re-

---

**15.** In particular, Mates claims that the bylaws require that a special meeting be called to remove a director from the board, which she maintains was not done. See First Am. Compl. ¶ 29.

viewing the statement as a whole. *See Batson v. Shiflett*, 325 Md. 684, 723, 602 A.2d 1191, 1210 (1992). Such an inquiry is required because "words have different meanings depending on the context in which they are used." *Id.; see also Hohman v. A.S. Abell Co.*, 44 Md.App. 193, 197, 407 A.2d 794, 797 (1979) (reviewing article and concluding that reasonable readers may have concluded the plaintiff was charged with a crime). However, if the words are capable of more than one meaning or a defamatory meaning could be inferred, then the meaning to be attributed to them is a question of fact for the jury. *Id.*

■ The Court reads the press release as simply announcing that Mates has been replaced as president, and that a new CEO will be selected. As for the comment that the new candidate will be one "with proven skill and experience in the industry who will be able to lead the Company in the continued development of its business and operations," it clear to the Court that it speaks only to the expected qualifications of the new CEO, and not intended to cast any aspersions on Mates. In fact, the statement that Mates was being replaced as president is presented in a completely separate paragraph than the statement about the new CEO's qualifications. Moreover, the Court does not see how this statement could possibly be considered, by any interpretation, defamatory to such an extent as to expose Mates to "public scorn, hatred, contempt or ridicule, thereby discouraging others in community from having a good opinion of, or associating with or dealing with [her]." *Batson*, 325 Md. at 722, 602 A.2d at 1210. If this Court was to so find, then any corporate executive would have a claim for defamation, when

the occasion arises for her removal, solely on the ground that the termination was publicly announced. However, words that are not derogatory do not become defamatory, even if published maliciously. See id. Accordingly, upon viewing the press release in its proper context and in light of the facts, the Court finds nothing defamatory that may be inferred from the rather innocuous statement. Thus, NAVI's motion to dismiss will be granted as to Count Ten.

## VIII. *Breach of Contract*

■ Following the hearing on May 3, 1999, in an apparent last ditch effort, Mates filed a First Amended Complaint to add an eleventh count for breach of contract. Therein, Mates alleges that NAVI breached her contract of employment by terminating her in contravention of the company's by-laws and by failing to compensate her for a portion of the time that she served as president. Mates recognizes and does not dispute that she is an at-will employee who may be terminated at any time. Mates also acknowledges that she is not basing her claim on any alleged contractual rights that stem from the by-laws. Instead, she maintains that her breach of contract claim is based on NAVI's failure to pay her compensation.[16] In particular, Mates claims that NAVI failed to pay her from September 23, 1998, the date in which the board of directors first voted to terminate her, until February 23, 1999, when the subsequent board of directors ratified the previous board's September 23rd resolution.

Although Mates asserts that her breach of contract claim does not arise from the by-laws, it must. In order for her claim to lie, Mates must first establish that her

**16.** For support, Mates relies on the recent Fourth Circuit decision in *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015 (4th Cir.1999). However, other than the one sentence of *dicta*, the *Spriggs* decision is completely inapposite to the case at bar. *See Spriggs*, 165 F.3d at 1019 ("For example, at-will employees certainly may sue their employers for failure to

pay wages or provide other agreed-upon benefits") (citing *dicta* in *Lane v. Ogden Entertainment*, 13 F.Supp.2d 1261, 1272 (M.D.Ala. 1998)). That case dealt with whether an at-will employment relationship created a contract that could not serve as a predicate for a racial discrimination action under 42 U.S.C. § 1981.

termination on September 23, 1998 was invalid or in violation of the by-laws.[17] However, Mates' at-will employment status and the fact that the by-laws explicitly provide that, "[t]he board, in its discretion, may remove any officer of the Corporation, without prejudice to such officer's rights under any employment contract," belie any basis for a claim of breach of contract. See Def. NAVI's Further Resp. in Support of its Mtn. to Dismiss, Ex. A, NAVI's By-laws, ¶ 6.10. Accordingly, NAVI's motion will be granted and Count Eleven will be dismissed.[18]

## CONCLUSION

To summarize, Mates has failed to state a claim under Counts One, Two, Eight, Nine, and Ten. In addition, Counts Three through Six will be dismissed on Mates' motion to withdrawn them, and Count Seven will be dismissed as moot. As such, all four defendants' motions to dismiss the First Amended Complaint will be granted in their entirety. A separate Order consistent with this Opinion will follow.

---

**17.** Even in the case cited by Mates, *Essential Enterprises Corp. v. Automatic Steel Products, Inc.*, 164 A.2d 437 (Del.Ch.1960), it was first determined that the removal of the directors was invalid.

**18.** The Court will treat NAVI's motion to dismiss the First Amended Complaint as one for summary judgment since it considered materials outside the pleading, namely the corporate by-laws of NAVI. *See* Fed.R.Civ.Proc. 12(b)(6).